RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

      *v.*

RICKY SIMMONDS,

            *Defendant-Appellant*.

No. 22-3072

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cr-00707-1—James S. Gwin, District Judge.

Decided and Filed:  March 16, 2023

Before:  McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ON BRIEF:**  Henry Joseph Hilow, HILOW & SPELLACY, Cleveland, Ohio, for Appellant. Vanessa V. Healy, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────

## OPINION

─────────────

THAPAR, Circuit Judge.  Ricky Simmonds claims that during his sentencing hearing, the district court improperly relied on the Presentence Report's recommendation rather than the parties' non-binding plea agreement.  Because the district court didn't plainly err, we affirm.

I.

The underlying facts of this case are undisputed.  From 2017 to 2020, Ricky Simmonds ran a drug-trafficking conspiracy that distributed fentanyl, methamphetamine, and cocaine throughout Northeast Ohio.

Simmonds organized the transportation of large quantities of drugs from other states into Cleveland.  Using five different phone numbers, Simmonds arranged for co-conspirators to deliver and pick up the fentanyl, methamphetamine, and cocaine from "drop" locations and stash the drugs in storage facilities.

Law enforcement intercepted sixteen parcels associated with the conspiracy.  In total, the parcels contained approximately 3,000 grams of fentanyl and 2,000 grams of methamphetamine.  IP addresses associated with Simmonds tracked the delivery of thirteen of those sixteen parcels.

Law enforcement also collected information through wiretaps.  In several wiretapped conversations, Simmonds discussed the quality, quantity, and price of the fentanyl pills he was distributing.  He also instructed his co-conspirators on the movement of drugs and money.

Finally, investigators executed several seizures during the investigation of Simmonds.  During two separate traffic stops, officers seized large quantities of fentanyl from co-conspirators acting under Simmonds's instructions (2,098 grams and 450 grams, respectively).  Investigators also searched an apartment and four storage units associated with Simmonds.    At these locations, investigators seized cash, cell phones, fentanyl, methamphetamine, cocaine, xylazine, and suspected marijuana, plus shipping and packaging supplies. At one unit, investigators also seized a firearm, ammunition, and Simmonds's personal belongings, including his passport and birth certificate.

Following these discoveries, the government charged all sixteen members of the "Simmonds Drug Trafficking Organization" with conspiring to distribute fentanyl, methamphetamine, and cocaine. R. 24, Pg. ID 138.  Following nearly a year of negotiations, Simmonds and the government reached a plea agreement under Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure.  In that agreement, Simmonds pled guilty to Counts 1, 2,

4–6, and 11–32 of the superseding indictment for conspiring to distribute drugs, possessing a controlled substance with intent to distribute, and using a cell phone to facilitate a felony drug offense. *See* 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)–(C), 843(b).

In the plea agreement, the parties made four stipulations relevant to this appeal. First, Simmonds agreed that "sentencing rests within the discretion of the Court," and that the "advisory guideline range will be determined by the Court at the time of sentencing, after a presentence report has been prepared by the U.S. Probation Office and reviewed by the parties." R. 205, Pg. ID 870. Second, Simmonds agreed that the parties' sentencing recommendations would not bind the court, and "that the Court alone will decide the advisory guideline range." *Id.* at 871. Third, the parties stipulated "that the amount of drugs involved in the offenses is more than 1,200 grams of fentanyl and less than 4 kilograms of fentanyl, which equates to a [base offense] level 32." *Id.* at 872. The government agreed to that drug quantity by excluding the packages of drugs tracked by IP addresses associated with Simmonds. Although the government could tie Simmonds to those IP addresses, it could not "specifically say at that moment in time when the IP address was generated who" was tracking the packages. R. 334, Pg. ID 2133.

Finally, the parties agreed Simmonds should get a three-level sentencing reduction for acceptance of responsibility. They also agreed that the government would argue at sentencing for (1) a two-level enhancement for possession of a firearm, and (2) another two-level enhancement for being an organizer or leader of a criminal activity—but that "no other specific offense characteristics, Guideline adjustments or Guideline departures apply." R. 205, Pg. ID 872. Aside from these conditions, the plea agreement did not state that the government had to make any sort of particular, affirmative representations in support of the agreed-upon base offense level at sentencing.

The probation office prepared a presentence report ("PSR") that departed from the parties' stipulated sentencing recommendation in multiple respects. First, the PSR set the base offense level at 36 rather than 32. Why? Because the PSR recommended holding Simmonds responsible "for each parcel his IP was associated with tracking," plus the quantities seized during the traffic stops and searches of the storage units. R. 290, Pg. ID 1877. Thus, the PSR recommended holding Simmonds responsible for a total of 48,641.48 kilograms of converted

drug weight. Second, whereas the parties had agreed that no more than two enhancements might apply, the PSR proposed four enhancements.

At sentencing, the district court followed the PSR and set the base offense level at 36. The court also accepted the PSR's recommendation on all four enhancements, bringing the total offense level to 43. At criminal history category II, Simmonds' Guideline range was life imprisonment. But the court varied downwards and sentenced Simmonds to 250 months' imprisonment. On appeal, Simmonds argues the government breached the plea agreement and asks us to vacate his sentence and remand for resentencing.

## II.

The parties agree Simmonds failed to argue below that the government breached the plea agreement, so we review for plain error. That means Simmonds "has the burden of establishing each of the four requirements for plain-error relief." *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). He must show the district court committed (1) an error that was (2) plain and (3) affected his "substantial rights." *Id.* at 2096. If he can satisfy those three "threshold requirements," then we have discretion to grant relief only if (4) we conclude "that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Id.* at 2096–97 (cleaned up). "Satisfying all four prongs of the plain-error test 'is difficult.'" *Id.* at 2097 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). And since Simmonds cannot satisfy any of the three threshold prongs of this test, we cannot grant relief on the fourth.

## A.

At the first prong of plain-error review, we're looking for "forfeited-but-reversible error." *United States v. Olano*, 507 U.S. 725, 732 (1993). To satisfy this part of the test, Simmonds must show (1) that the government breached the plea agreement and (2) that the district court erred by failing to rectify that breach sua sponte. *See* Fed. R. Crim. P. 52(b). Here, the government did not breach the plea agreement, so Simmonds cannot make either showing.

1.

First, Simmonds cannot show that the government breached the plea agreement. In the plea agreement, the government agreed that the drug quantities supported a base offense level of 32. It further agreed to argue for only two enhancements: (1) a two-level enhancement for possession of a firearm, and (2) another two-level enhancement for being an organizer or leader of a criminal activity. In accordance with those promises, the government filed a sentencing memorandum requesting the district court sentence Simmonds "to a period of incarceration within the guideline range as outlined in the plea agreement," highlighting the stipulated base offense level of 32, and reiterating that the government would argue for the application of only two enhancements. R. 302, Pg. ID 1947–50. Thus, the government's sentencing memorandum adhered to its promises in the plea agreement.

The question remains whether the government reneged on its promises during the sentencing hearing. It didn't.

At sentencing, defense counsel objected to the Guidelines calculations in the PSR because it recommended a higher sentence than the plea agreement. In the plea agreement, the government had calculated the base offense level by holding the defendant responsible only for the quantity of drugs it believed it could prove, beyond a reasonable doubt, that Simmonds had distributed. That didn't include the intercepted packages. The PSR, by contrast, held Simmonds responsible for drug quantities based on the "relevant conduct" standard in section 1B1.3 of the Sentencing Guidelines—a lower bar permissible at sentencing. That lower bar made possible the inclusion of the intercepted parcels.

During argument on this objection, the government answered numerous factual questions from the district court, explaining how it had tied the intercepted packages to Simmonds's IP addresses. That was necessary: "[t]he government's obligation to furnish relevant information to the sentencing court does not vanish merely because the government has a corollary obligation to honor commitments made under a plea agreement." *United States v. Moncivais*, 492 F.3d 652, 664 (6th Cir. 2007) (quoting *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000)). We've recognized that there's a line "between advocacy, on one hand, and providing the district court

with relevant factual information, on the other." *Id.* And here, the government stayed on the right side of that line. The prosecutor answered the court's direct questions but never requested a base offense level higher than 32.

Ultimately, the district court concluded that Simmonds should be held responsible under U.S.S.G. § 1B1.3 for the intercepted packages, so it followed the PSR's recommendation and set the base offense level at 36. But because the government specifically requested a base offense level of 32 in its sentencing memorandum (and made no contrary request at any time), it didn't breach the plea agreement with respect to the base offense level.

Nor did the government breach the plea agreement with respect to the four disputed enhancements. The plea agreement permitted the government to argue for a two-level enhancement for possession of a firearm, and another two-level enhancement for being an organizer or leader of a criminal activity. The government did just that. Ultimately, the district court sided with the PSR's recommendation, applying a two-level firearm enhancement and a four-level organizer-or-leader enhancement.

Absent any urging from the prosecution, the district court also applied two more enhancements. First, the district court applied a two-level enhancement for "maintain[ing] a premise for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The government never once argued that this enhancement applied. Second, the district court applied a four-level increase because it found Simmonds "knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl." U.S.S.G. § 2D1.1(b)(13). When this came up at sentencing, the government argued *against* the enhancement. Again, although the district court decided to follow the recommendation in the PSR over the plea agreement, the prosecution did not breach its promises but merely fulfilled its obligation to furnish relevant information to the sentencing court. *See Moncivais*, 492 F.3d at 664–65.

2.

Second, even if Simmonds could show that the prosecution breached the plea agreement, he still must separately show that the district court erred by failing to rectify the prosecution's breach sua sponte.  And that's a tough showing to make for several reasons.

For starters, it's often several months between the plea and sentencing hearing.  During that time, the district court handles plea agreements in countless other cases.  And unless it's a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(c), it doesn't bind the district court at all.  So while the district court is well aware of the plea agreement at sentencing, we can't expect it to have memorized the minutiae—nor is it obliged to.  By contrast, the defendant arrives at the sentencing hearing intimately familiar with the agreement's terms and in a far better position to recognize a breach when it occurs.

Indeed, our caselaw recognizes that defendants are in the best position to recognize errors at sentencing and object to them.  That's why we've imposed a procedural rule "requiring district courts, after pronouncing the defendant's sentence but before adjourning the sentencing hearing, to ask the parties whether they have any objections to the sentence just pronounced that have not previously been raised." *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004).  That rule recognizes that district courts can't be expected to catch everything without help from the parties.  And that "final opportunity for objections after the pronouncement of the sentence" allows the district court, upon objection, "to correct on the spot" any breach of the plea agreement that the parties find relevant. *Id.* at 873 (citation omitted).

Moreover, the prosecution's error doesn't always manifest into a district-court error. Imagine, for example, that the government promises in the plea agreement to recommend a reduction for acceptance of responsibility but fails to do so at sentencing.  The district court notices the conflict with the plea agreement and asks the government to explain.  The prosecutor realizes his mistake and requests the reduction as promised.  The breach was "curable" and, indeed, cured—"the prosecution simply forgot its commitment and is willing to adhere to the agreement." *Puckett*, 556 U.S. at 140.

All of this reflects a fundamental principle of appellate procedure:  we review district-court errors, not government ones.  *See Olano*, 507 U.S. at 732 (on plain-error review, we're looking for "forfeited-but-reversible error.").  Courts have sometimes conflated the two in the plea-breach context.  But the Supreme Court has instructed us to remain laser-focused on the actions of the district court.  *See, e.g.*, *Puckett*, 556 U.S. at 134.[1]

Thus, even if the prosecution breaches the plea agreement, a defendant still must show the district court erred by failing to recognize and rectify that breach sua sponte—and that's a tough showing to make.

Here, Simmonds can't show that the prosecution breached the plea agreement.  Nor can he show that that the district court committed reversible error by failing to notice and rectify a breach of the plea agreement sua sponte.  Thus, he cannot satisfy his burden on the first prong of the plain-error test.

B.

Even assuming he can demonstrate that the district court erred, Simmonds can't show the error was "plain"—meaning "clear" or "obvious."  *Olano*, 507 U.S. at 734.  We will find that an obvious error occurred only "in exceptional circumstances . . . where the error is so plain that the trial judge was derelict in countenancing it."  *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (cleaned up).

That's a high bar in any context, but especially so in "plea-agreement cases," where the second prong of plain-error review "will often have some 'bite.'"  *Puckett*, 556 U.S. at 143.  Why is that so?  Because "[w]e treat plea agreements like contracts."  *Warren*, 8 F.4th 444, 448 (6th Cir. 2021).  And contracts can be ambiguous.  So the scope of the government's promises

---

[1]In *Puckett*, the Supreme Court clarified the narrow scope of plain-error review and its focus on district-court error.  *See, e.g.*, *Puckett*, 556 U.S. at 134 ("If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. . . . This limitation on appellate-court authority serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them.").  In light of the Supreme Court's guidance, we need not puzzle over some arguably broader statements in our pre-*Puckett* caselaw.  *See United States v. Barnes*, 278 F.3d 644, 658 (6th Cir. 2002) ("[T]he government's breach [of the plea agreement] amounted to reversible error under a plain error standard of review."); *United States v. Swanberg*, 370 F.3d 622, 627 (6th Cir. 2004) ("Plain error may be committed by the government as well as by the district court.").

will sometimes "be open to doubt," such that "[n]ot all breaches will be clear or obvious." *Puckett*, 556 U.S. at 143.**[2]**

Thus, to satisfy his burden on the second prong of the plain-error test, Simmonds must show that the government's breach is obvious. In other words, he must show that the government promised *A* and instead delivered *not A*. *See, e.g.*, *Santobello v. New York*, 404 U.S. 257, 259 (1971) (explaining that the prosecutor promised to make "no sentence recommendation" and instead "recommended the maximum one-year sentence"). If, upon reading the plea agreement, the scope of the government's promises presents an arguable interpretive question, then by definition any breach cannot qualify as "clear or obvious." *Puckett*, 556 U.S. at 143. Nor would we require the district court to intervene sua sponte absent such contractual clarity.

Here, to prevail on prong two, Simmonds would have to show that the plea agreement required the government to state affirmatively at sentencing what it had already made clear in its sentencing memorandum—that it had agreed to a base offense level of 32. But the plea agreement contained no such requirement: it said only that the defendant and the government agreed that the amount of drugs involved in the offenses "equate[d] to a level 32." R. 205, Pg. ID 872. At best, this language is ambiguous about when and how the government had to remind the district court of the stipulated base offense level. It is far from obvious from the contractual language that the government breached a promise. Thus, absent any objection from the defendant, we would not expect the district court to intervene sua sponte.

## C.

Even assuming Simmonds could prove an error, and even if he could prove that error was plain, he likewise fails on the third prong of the plain-error test. Prong three requires Simmonds to show the district court's plain error "affected [his] substantial rights, which in the ordinary

---

**[2]**In ordinary contract law, of course, a party's failure to complain at the time a breach occurs often qualifies as a waiver of the right to complain about the breach later. *See* 13 *Williston on Contracts* § 39:15 (4th ed. 2022 update) ("[O]nce it has been established that a right has been waived, the party possessing the right prior to the waiver is generally precluded from asserting it in a court of law."); *see also id.* § 39:14 ("[W]aiver may be accomplished either expressly or impliedly through conduct.").

case means he . . . must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (cleaned up). He cannot make that showing.

On this point, Simmonds argues that the prosecutor's failure to "affirmatively assert . . . the government's desire for the stipulated offense level of the plea agreement" affected his substantial rights by "result[ing] in a substantially greater sentence being imposed." Appellant Br. 22. That argument fails for at least two reasons.

First, the government affirmatively asserted its desire for the stipulated offense level in its Sentencing Memorandum. Then, at the hearing, defense counsel reminded the district court that the government had stipulated to a base offense level of 32. *See* R. 334, Pg. ID 2130 ("[I]n the presentence investigative report, it places the base offense level at a 36. The plea agreement, Your Honor, after extensive review of discovery negotiations and stipulations for over a year, the base offense level was placed at a 32."); *id*. at 2171–72 ("There is a great discrepancy here between the plea agreement and the probation office . . . . [The government] was clear in the sentencing memorandum that they also are requesting that the Court follow the guidelines within the plea agreement."). The government never disputed this or argued for a different base offense level. And at the close of the hearing, the government tried to call the court's attention to the plea agreement one more time. *Id.* at 2178. In short, even if the government could have done more to emphasize the stipulation, Simmonds hasn't shown that the district court was unaware of the parties' agreement before it imposed the sentence.

Second, Simmonds cannot show a "reasonable probability" that "the outcome of the proceeding would have been different" if the government had reiterated the stipulated offense level earlier in the sentencing hearing. *Molina-Martinez*, 578 U.S. at 194 (citation omitted). At sentencing, the district court repeatedly emphasized that it was rejecting the stipulation in the plea agreement for the recommendations in the PSR. *See, e.g.*, R. 334, Pg. ID 2160 (rejecting the prosecutor's argument in favor of the probation officer's recommendation); *id*. at 2164 (same). Simmonds thus presents no reason to think the district court would have done differently if the government had repeated its earlier request.

\*          \*          \*

Because Simmonds cannot "satisfy [the] three threshold requirements" for plain-error relief, we have no occasion to consider whether Simmonds meets the fourth prong.  *Greer*, 141 S. Ct. at 2096.  Accordingly, we affirm.