RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

THOMAS G. O'LEAR,

                *Defendant-Appellant*.

No. 22-3835

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:19-cr-00349-1—Dan A. Polster, District Judge.

Argued: July 28, 2023

Decided and Filed: January 8, 2024

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Elliot D. Morrison, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge. Thomas O'Lear ran a company that ostensibly offered mobile x-ray services for residents at nursing homes. But O'Lear used the company to cheat Medicare and Medicaid programs out of almost $2 million. He relied on the identities of nursing-home residents to bill for fictitious x-rays. To conceal this fraud during an audit, he also forged the

names of his staff and put duplicate x-rays of some patients in the files of others. A jury convicted him of healthcare fraud, making a false statement in connection with healthcare services, and aggravated identity theft. The district court sentenced him to 180 months' imprisonment.

O'Lear raises several questions on appeal, including the following two: Did the district court violate his Sixth Amendment right to an "impartial jury" by excluding individuals who had not been vaccinated against COVID-19 from the pool of potential jurors? And were the nursing-home residents "victims" of O'Lear's fraud under a "vulnerable victims" sentencing enhancement even though Medicare and Medicaid suffered the monetary losses? Our respective answers: No and yes. Unlike members of a particular race or sex, the unvaccinated do not qualify as the type of "distinctive group" that can trigger Sixth Amendment concerns with excluding a "fair cross section of the community" from the jury pool. *Lockhart v. McCree*, 476 U.S. 162, 174, 184 (1986). And because O'Lear used the identities and health records of nursing-home residents without their permission, he "[took] advantage of" them in a way that made them "victims" of his fraud under the ordinary understanding of that term. *United States v. Webster*, 615 F. App'x 362, 364 (6th Cir. 2015) (citation omitted). O'Lear's remaining arguments also lack merit. We thus affirm.

I

We describe the facts in the light most favorable to the government because the jury found O'Lear guilty of nearly all charges. *See United States v. Maya*, 966 F.3d 493, 496 (6th Cir. 2020).

In 2005, O'Lear and his wife formed Portable Radiology Services to provide mobile x-ray services in northeast Ohio. The company also became eligible to submit claims to Medicare and Medicaid at this time. It served elderly and disabled patients who lived at nursing homes or similar facilities. These patients might need x-rays to diagnose such things as pneumonia or broken bones.

When a nursing home ordered x-rays from Portable Radiology Services, the company's x-ray technicians would drive its equipment to the home. Upon their arrival, the technicians

would complete a "requisition form" for each resident who needed x-rays. The nursing home would have partially filled out this form by identifying the doctor who requested the x-rays and the reasons for them. The technicians would sign the form to confirm that they took the x-rays on the identified date. After completing the x-rays, the technicians would process them back at the company's offices and email or fax them to an affiliated radiologist for a medical review. The radiologist would dictate a formal report and call the technicians to convey any immediate findings. Before the radiologist completed the report, the technicians would record the immediate findings and alert the nursing home of the results. The technicians would also later provide copies of the relevant forms to O'Lear so that he could bill Medicare or Medicaid for the company's services.

Portable Radiology Services had a reasonable stream of business through 2013. One of its former x-ray technicians believed that she took an average of 18 x-rays a day during this time. But business began to slow when the company's largest nursing-home customers ended the relationship. By 2016, x-ray technicians might perform just one x-ray (or even none) on any given day.

Surprisingly, this slowdown did not hurt the company's bottom line. To the contrary, its payments from Medicare and Medicaid skyrocketed over the years. In 2013, Portable Radiology Services obtained less than $200,000 from these programs. By 2016, those payments had ballooned to over $800,000.

How did the company's revenue grow while its business declined? From late 2015 to 2017, O'Lear filed hundreds of fraudulent claims with Medicare and Medicaid on behalf of his company. O'Lear orchestrated this fraud in different ways. For many patients, he billed for a legitimate x-ray (backed by proper records) and then dozens of illegitimate ones (lacking documentary support). As an example, O'Lear billed 178 claims and received $13,859.76 for a patient even though the company's supporting documentation for these claims justified only two for a total of $156.71. O'Lear also billed for x-rays even after patients had died. And he billed for excessive transportation costs. X-ray technicians would sometimes drive to a nursing home and take x-rays of multiple patients, but O'Lear would charge this single transportation expense to every patient.

All told, a statistical expert opined that Portable Radiology Services obtained an estimated $1.989 million from the Medicare and Medicaid programs based on fraudulent claims. O'Lear used much of these illegitimate funds on personal items, including a new home and car.

In 2016, CareSource, a Medicare and Medicaid payor, uncovered this fraud during an audit. In response to a request for documents, O'Lear produced doctored records. He, for example, put the same x-ray images in the files of many patients. Some files for male patients even contained x-rays of female anatomy. O'Lear also put a different patient's name on x-rays that still identified the true patient. And he forged the signatures of technicians and doctors on the forms justifying the x-rays.

CareSource alerted the authorities. The government eventually charged O'Lear with 25 counts of healthcare fraud for specific false claims that Portable Radiology Services submitted to Medicare or Medicaid, all in violation of 18 U.S.C. § 1347. It also charged him with one count of making false statements in connection with his healthcare services for his attempts to cover up the fraud, in violation of 18 U.S.C. § 1035(a)(1). After the parties' plea negotiations broke down, the government filed a superseding indictment adding two counts of aggravated identify theft, in violation of 18 U.S.C. § 1028A(a)(1).

O'Lear stood trial. Government agents and former employees detailed the scope of his fraud. Testifying in his defense, O'Lear conceded that his company had committed a "significant amount" of fraud but blamed an x-ray technician named Brien Fletcher. O'Lear Tr., R.95, PageID 1610–18, 1788. Fletcher, who made about $26,000 in 2016, refuted this claim. The jury did not believe O'Lear. It found him guilty on 25 of the 28 counts.

At sentencing, the district court calculated O'Lear's guidelines range as 188 to 235 months' imprisonment. It varied downward by imposing a 180-month sentence.

II

O'Lear raises three groups of claims on appeal. He primarily argues that the composition of his jury pool violated the Sixth Amendment. He also challenges his two aggravated-identity-theft convictions. And he objects to his 180-month sentence on various grounds.

### A. Sixth Amendment Challenge to Jury Pool

Before O'Lear's trial, the district court announced that it planned to allow individuals to serve on the jury only if they had been fully vaccinated against COVID-19.  O'Lear objected that the district court's order would violate his Sixth Amendment right to have a jury pool made up of a fair cross section of the Northern District of Ohio.  The court disagreed.  *See United States v. O'Lear*, 2022 WL 419947, at *1–3 (N.D. Ohio Feb. 11, 2022).  We treat its ultimate holding that the vaccination mandate did not violate O'Lear's Sixth Amendment rights as a "mixed question of law and fact" reviewed de novo.  *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998).

### 1. Background Law

The Sixth Amendment gives a criminal defendant the right to "an impartial jury of the State and district wherein the crime shall have been committed[.]"  U.S. Const. amend. VI.  At its core, this right to an "impartial" jury prohibits a court from empaneling jurors who have a personal bias against the defendant or who have decided on the defendant's guilt before hearing any evidence.  *See Irvin v. Dowd*, 366 U.S. 717, 722–28 (1961); *United States v. Burr*, 25 F. Cas. 49, 50–51 (C.C.D. Va. 1807) (No. 14,692G) (Marshall, C.J.).  But the right also extends beyond this narrow guarantee.  If it did not, the government could "stack the deck" against a defendant by restricting jury service to only those individuals who tend to favor prosecutors.  *Holland v. Illinois*, 493 U.S. 474, 480–81 (1990).  So ever since *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Supreme Court has held that the Sixth Amendment regulates how the government may assemble the juries that will decide on the guilt or innocence of defendants.  *See id.* at 528.  This jury-assembly process must ensure that the broad pool of potential jurors (often referred to as the jury "venire") represents "a fair cross section of the community."  *Duren v. Missouri*, 439 U.S. 357, 359 (1979).

To be clear, the Sixth Amendment does *not* require that the assembled jury *itself* (often referred to as the "petit" jury) represent a fair cross section of the community.  *See Holland*, 493 U.S. at 478; *Lockhart v. McCree*, 476 U.S. 162, 173–74 (1986).  After all, the amendment guarantees an "*impartial*" jury, not a "*representative*" one.  *Holland*, 493 U.S. at 480.  So, unlike the Fourteenth Amendment's Equal Protection Clause, the Sixth Amendment does not limit a

prosecutor's use of preemptory challenges to excuse specific jurors.  *See id.* at 478–84; *cf. Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

What, then, must defendants show to prove a violation of the right to a jury pool made up of a fair cross section of the community?  The Supreme Court has adopted a burden-shifting framework to enforce this right.  *See Duren*, 439 U.S. at 364, 367–68.  Defendants must first establish a three-part prima facie case.  *See Berghuis v. Smith*, 559 U.S. 314, 327 (2010); *Allen*, 160 F.3d at 1103.  They must identify "a 'distinctive' group in the [broader] community." *Duren*, 439 U.S. at 364.  They then must show that the "representation" of this group in the jury pool does not fairly and reasonably match the representation of the group in that community.  *Id.* They lastly must prove that the jury-assembly process creates the complained-of "underrepresentation" by systematically excluding the group from jury pools.  *Id.*  If a defendant establishes this prima facie case, the burden switches to the government to justify the component of the assembly process that systematically excludes the identified group.  *Id.* at 367–68.  The government must show that the relevant component "manifestly and primarily" furthers a "significant" government objective.  *Id.*

This case concerns the first ("distinctive group") requirement of a defendant's prima facie case.  The Supreme Court has refused to "precisely define" what it means by this requirement's key adjective: "distinctive." *Lockhart*, 476 U.S. at 174.  Yet this "amorphous" word does not do much on its own to clarify the eligible groups.  *Silagy v. Peters*, 905 F.2d 986, 1010 (7th Cir. 1990).  If read literally, it could "refer[]" to almost any group with a shared "characteristic" that "distinguishes" it from "other" people. *Webster's New International Dictionary of the English Language* 756 (2d ed. 1934); IV *Oxford English Dictionary* 858 (2d ed. 1989).  So, for example, one might view children as a distinctive group (as compared to adults).  Or one might view noncitizens as a distinctive group (as compared to citizens).  Or one might view felons as a distinctive group (as compared to those who have not committed any crimes).  Yet federal law has long barred those under the age of 18, those who lack U.S. citizenship, and those who have committed felonies from serving on juries.  *See* 28 U.S.C. § 1865(b)(1), (5).  Do all these juror disqualifications infringe upon the fair-cross-section right?  The Supreme Court's precedent has

never suggested that result because the Court has never read the word "distinctive" in this literal fashion. *See Lockhart*, 476 U.S. at 174.

If the Court has not read the word literally, then how has it undertaken the "daunting" task of separating traits that make a group "distinctive" from those that do not? Richard M. Re, Note, *Re-Justifying the Fair Cross Section Requirement: Equal Representation and Enfranchisement in the American Criminal Jury*, 116 Yale L.J. 1568, 1593–94 (2007). The Court has "linked" this "distinctiveness" element to the "purposes" behind its fair-cross-section right. *Lockhart*, 476 U.S. at 174. It has identified three general purposes. *See id.* First, the right acts as a check against a prosecutor's "exercise of arbitrary power[.]" *Taylor*, 419 U.S. at 530. It does so by placing the "commonsense judgment" of the "community" in between criminal defendants and the government's efforts to deprive them of their life or liberty. *Id.* Second, the right aims to serve society at large. *Id.* By barring governments from prohibiting identifiable segments of the population from serving as jurors, the right helps to increase "public confidence in the fairness of the criminal justice system." *Id.* Third, the right promotes the "civic responsibility" necessary for good government. *Id.* at 531 (quoting *Thiel v. S. Pac. Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)). By spreading the "administration of justice" to as many citizens as possible, the right facilitates public engagement in governmental affairs. *Id.*

This purpose-based approach has led the Court to read the distinctiveness element narrowly. Since *Taylor*, it has found groups distinctive only when they shared an "immutable" trait. *Lockhart*, 476 U.S. at 175; *see Holland*, 493 U.S. at 485. In *Duren* and *Taylor*, for example, the Court held that women qualified as a distinctive group such that their systematic exclusion from jury pools violated the Sixth Amendment. *See Duren*, 439 U.S. at 364; *Taylor*, 419 U.S. at 531. And when defendants have challenged the exclusion of individuals from grand juries under the Equal Protection Clause, the Court has likewise treated racial groups (African Americans and Mexican Americans) as distinctive. *See Lockhart*, 476 U.S. at 175 (citing *Peters v. Kiff*, 407 U.S. 493, 503–04 (1972) (plurality opinion); *Castaneda v. Partida*, 430 U.S. 482, 495 (1977)).

The three purposes underlying the fair-cross-section right justified these results. Because the relevant trait (sex or race) does not affect a person's ability to serve, the challenged sex- and

race-based exclusions risked "arbitrarily" biasing the "common-sense judgment" of the jury. *Id.* Next, a court's reliance on "immutable" traits to exclude jurors created an "appearance of unfairness" because jurors have no ability to control those traits. *Id.* Lastly, the discrimination broadly deprived "historically disadvantaged groups" of "their right as citizens" to participate in the government. *Id.*

Apart from sex- and race-based classifications, though, courts have consistently rejected other claims that a shared trait rendered a group "distinctive." *Lockhart* started this trend. There, the State of Arkansas charged Ardia McCree with capital murder. 476 U.S. at 166. The state court excluded from McCree's jury all prospective jurors whose views against the death penalty would bar them from imposing that punishment. *Id.* In federal habeas proceedings, McCree argued that this exclusion violated the Sixth Amendment because people with "shared attitudes" against the death penalty qualified as a "distinctive" group. *Id.* at 167, 174. The Court disagreed, holding that the Sixth Amendment allows courts to exclude this group from jury service in capital cases. *Id.* at 174; *see Buchanan v. Kentucky*, 483 U.S. 402, 415–16 (1987). In finding that the group did not qualify as "distinctive," the Court again turned to the purposes of the fair-cross-section right. It explained that the exclusion of those unwilling to impose the death penalty served a "legitimate interest" in obtaining a neutral jury and did not seek to "arbitrarily skew" the jury's makeup. *Lockhart*, 476 U.S. at 175–76. The Court thus incorporated into the defendant's prima facie case an initial assessment of the government's justifications for the challenged assembly procedure. The Court next noted that, unlike immutable traits, an individual's views about the death penalty are "within the individual's control." *Id.* at 176. So members of this group could serve on the jury by setting aside their views in the case. *Id.* And because the group included only those who could not follow the law, the Court saw no "appearance of unfairness" in excluding them. *Id.* This group lastly could still serve as jurors in other criminal or civil cases. The exclusion thus did not deprive them of "their basic rights of citizenship." *Id.*

Since *Lockhart*, lower courts have reached similar results. Consider three examples. Governments often use lists of registered voters to populate jury pools. *See* 28 U.S.C. § 1863(b)(2)–(3). Do the *nonvoters* that are excluded by these lists qualify as a distinctive group

for Sixth Amendment purposes?   No, courts (including our own) have "almost always . . . rejected" the claim that jury pools made up of voters flunk the fair-cross-section requirement.   Jane M. Draper, *Validity of Requirement or Practice of Selecting Prospective Jurors Exclusively from List of Registered Voters*, 80 A.L.R.3d 869, § 2[a], Westlaw (database updated 2023); *see United States v. Coleman*, 835 F. App'x 73, 76 (6th Cir. 2020); *United States v. Green*, 435 F.3d 1265, 1271–72 (10th Cir. 2006); *United States v. Cecil*, 836 F.2d 1431, 1444–55 (4th Cir. 1988) (en banc).   Courts have reasoned that governments rely on voter lists as an economical way to find jurors—not a discriminatory way to skew juries.   *See Reed v. Wainwright*, 587 F.2d 260, 264 (5th Cir. 1979) (per curiam).   And they have found that the reliance on voter lists does not raise fairness concerns so long as registration remains open to all.   *See Cecil*, 836 F.2d at 1448–49.   If anyone can register to vote, the exclusion from jury service results simply from a citizen's "personal" choice not to register rather than from the government's jury-assembly procedures.   *Id.* at 1447 (citation omitted).

Governments have also long imposed age limits on jury service.   *Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 332–33 (1970); 3 William Blackstone, *Commentaries on the Laws of England* 364 (1768).   Here, too, courts (also including our own) have held that people tied together by "age alone" do not qualify as a distinctive group.   *Wysinger v. Davis*, 886 F.2d 295, 296 (11th Cir. 1989) (collecting cases).   So they have rejected proposed groups defined as "young adults."   *Ford v. Seabold*, 841 F.2d 677, 681–82 (6th Cir. 1988); *see Johnson v. McCaughtry*, 92 F.3d 585, 592–93 (7th Cir. 1996); *Barber v. Ponte*, 772 F.2d 982, 997–1000 (1st Cir. 1985) (en banc).   They have also rejected groups defined as those over 65 or 70.   *See Brewer v. Nix*, 963 F.2d 1111, 1112–13 (8th Cir. 1992); *Silagy v. Peters*, 905 F.2d 986, 1009–11 (7th Cir. 1990).

And governments have traditionally authorized those in certain occupations to opt out of jury service.   *See Rawlins v. Georgia*, 201 U.S. 638, 639–40 (1906); Blackstone, *supra*, at 364.   Courts have generally rejected claims that the exempted groups were "distinctive."   They have, for example, rejected challenges to the exclusions of doctors and lawyers, *State v. Puente*, 431 N.E.2d 987, 989 (Ohio 1982), "blue collar workers," *Anaya v. Hansen*, 781 F.2d 1, 8 (1st Cir. 1986), and "college students," *United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir. 1992);

*Ford*, 841 F.2d at 682–83. As the Supreme Court explained, these exemptions have not historically existed to bias the jury's makeup. *Taylor*, 419 U.S. at 534. Rather, they have existed because of the "special hardship" that some individuals would face if required to serve on a jury or because the "uninterrupted performance" of their job duties promoted the "community's welfare." *Id.*

### 2. Application to Vaccine Requirement

Under this caselaw, individuals who have not been vaccinated against COVID-19 do not qualify as a "distinctive" group for Sixth Amendment purposes. The Supreme Court's purpose-based approach to the "distinctiveness" element all but compels that result. *Lockhart*, 476 U.S. at 174–75. *First*, no evidence suggests that the district court excluded the unvaccinated to "arbitrarily skew" the jury pool so that it contained individuals biased against O'Lear. *Id.* at 176. As an initial matter, the court identified "legitimate" health reasons for this decision. *Id.* at 175. It explained that the unvaccinated could disrupt O'Lear's potentially lengthy trial if they became ill or exposed others to COVID-19. *O'Lear*, 2022 WL 419947, at *3. The court bolstered this conclusion with its own experience in a recent case, noting that it had trouble forming a jury because unvaccinated jurors (or their relatives) kept getting sick. *Id.* at *2. Nor is this health reason anything new. Courts have long exempted jurors based on health or medical conditions that could interfere with their service. *See Excusing Qualified Juror Drawn in Criminal Case as Ground of Complaint by Defendant*, Annotation, 96 A.L.R. 508, § III(d), Westlaw (database updated 2023) (collecting cases); Blackstone, *supra*, at 364. That the court's rationale resembles a "historically common" one further shows that it did not impose the vaccine requirement for any invidious reason. *Brewer*, 963 F.2d at 1113; *see also United States v. Colon*, 64 F.4th 589, 595–96 (4th Cir. 2023).

In addition, O'Lear has not shown that the unvaccinated have such *uniform* and *unique* attitudes that their exclusion would risk diluting the "representativeness" of the jury pool. *See Taylor*, 419 U.S. at 531. Just as college students and nonvoters may opt to attend school or decline to register for many reasons, *see Ford*, 841 F.2d at 683; *Gorin v. United States*, 313 F.2d 641, 644 (1st Cir. 1963), so too individuals have declined COVID-19 vaccinations on a number of grounds. These grounds include government skepticism, medical complications, or religious

objections. And regardless, unlike a group's shared views about the death penalty, *see Lockhart*, 476 U.S. at 175–76, any shared views about vaccines would not suggest that this group would approach O'Lear's fraud case from a common perspective that is unique to the group. Instead, the diverse attitudes of unvaccinated individuals would be "adequately represented" by the diverse attitudes of vaccinated individuals who remained eligible to serve. *Johnson*, 92 F.3d at 593.

*Second*, the district court's order excluding unvaccinated individuals from O'Lear's trial does not create an "appearance of unfairness" within the meaning of *Lockhart*. 476 U.S. at 176. An individual's decision about whether to get vaccinated (like an individual's opinion about the death penalty) is largely "within the individual's control." *Id.* So this exclusion does not resemble those that the Court has found to undermine the public's confidence in our justice system: exemptions that bar jury service based on a person's "immutable" traits. *Id.* at 175. And we doubt that the public would view the court's exclusion in this case as "any more unfair than," say, the longstanding exclusions tied to a prospective juror's age. *Silagy*, 905 F.2d at 1011. Yet, as noted, courts have uniformly rejected age-based challenges under the Sixth Amendment. *Wysinger*, 886 F.2d at 296; *see Ford*, 841 F.2d at 681–82.

*Third*, the district court's order excluding unvaccinated individuals did not permanently bar "them from serving as jurors in other criminal cases" and so did not deprive them of "their basic rights of citizenship." *Lockhart*, 476 U.S. at 176. Rather, the court imposed a short-term order at the height of the pandemic. The court also highlighted the special need for the order in O'Lear's case because his trial could last for several weeks. *O'Lear*, 2022 WL 419947, at *3. So, unlike the permanent bans on jury service once imposed on "historically disadvantaged groups," the court did not bar the unvaccinated from "sharing in the administration of justice" in future cases. *Lockhart*, 476 U.S. at 175 (citation omitted).

Apart from the Supreme Court's three purposes, substantial precedent supports our conclusion. Courts across the country have held that those unvaccinated from COVID-19 are not a distinctive group for purposes of the Sixth Amendment right to a jury made up of a fair cross-section of the community. *See United States v. Pelayo*, 2023 WL 4858147, at *3 (9th Cir. July 31, 2023) (mem.); *United States v. Cole*, 2023 WL 2914291, at *2 (9th Cir. Apr. 12, 2023)

(mem.); *United States v. Nelson*, 2022 WL 1093661, at * 3–4 (N.D. Cal. Apr. 12, 2022); *United States v. Elder*, 592 F. Supp. 3d 48, 64–65 (E.D.N.Y. 2022); *United States v. Cole*, 583 F. Supp. 3d 1037, 1042–44 (N.D. Ohio 2022); *United States v. Elias*, 579 F. Supp. 3d 374, 380–82 (E.D.N.Y. 2022); *Joffe v. King & Spalding LLP*, 575 F. Supp. 3d 427, 434 (S.D.N.Y. 2021); *United States v. Moses*, 566 F. Supp. 3d 217, 221–23 (W.D.N.Y. 2021); *cf. Colon*, 64 F.4th at 594–96.

O'Lear responds with a "disparate impact" argument. He cites statistics suggesting that significant "demographic differences" exist between the vaccinated and unvaccinated populations. Appellant's Br. 15–16. According to O'Lear, African Americans, those living in rural counties, young adults, and those skeptical of the government have gotten the vaccine less often than white people, those who live in urban counties, the elderly, and those more trusting of the government.

This argument fails on multiple grounds. To begin with, we have held that two of O'Lear's subgroups ("young adults" and those who live in "rural" locations) do not qualify as "distinctive." *Ford*, 841 F.2d at 681–82; *Green*, 435 F.3d at 1271–72; *see United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012). If a more systematic exclusion of these groups does not raise Sixth Amendment red flags, neither does a vaccine mandate that has a modest disparate impact on them.

O'Lear's claim that the unvaccinated more commonly distrust government fares no better. In the past, other defendants have likewise argued that groups such as "rural people" or nonvoters qualify as distinctive because they share "anti-government" or "anti-establishment" views. *Green*, 435 F.3d at 1271; *Reed*, 587 F.2d at 264. But courts have rejected these claims as too speculative. *Green*, 435 F.3d at 1271; *Reed*, 587 F.2d at 264. And O'Lear's unsupported speculation about the shared views of the unvaccinated does not suffice to prove the group's distinctiveness.

Our caselaw also rebuts O'Lear's final argument that the court's vaccination requirement had an unconstitutional disparate impact along racial lines. Many defendants have likewise argued that the use of voter lists to identify potential jurors disparately affected minorities

because their members traditionally registered to vote less frequently than others. But we and other courts have consistently rejected this claim, so long as the "right to register" to vote was legally and practically "open" to all. *Cecil*, 836 F.2d at 1447–48; *see Watkins*, 691 F.3d at 850–51; *United States v. Odeneal*, 517 F.3d 406, 411–12 (6th Cir. 2008). This precedent dooms O'Lear's argument because he does not dispute that the vaccine also remains "open" to all. *Cecil*, 836 F.2d at 1448.

We end with two disclaimers. As for the first disclaimer, O'Lear refers in passing to the Jury Selection Services Act of 1968, 28 U.S.C. §§ 1861–78. This Act establishes a statutory "policy" that litigants in federal court should receive trials by juries made up of "a fair cross section of the community" of the relevant district. 28 U.S.C. § 1861. We have suggested that the law adopts the same standards as the Sixth Amendment. *See Allen*, 160 F.3d at 1102. But O'Lear makes no distinct arguments under it. So we need not consider this issue. As for the second disclaimer, O'Lear has raised only a Sixth Amendment challenge. We thus need not consider any other constitutional or statutory challenge to the court's order. For example, we do not consider whether the court had an adequate statutory basis to issue it.

## B. Challenges to Convictions for Aggravated Identify Theft

O'Lear next disputes his two convictions for aggravated identity theft under 18 U.S.C. § 1028A(a)(1). He first argues that the government engaged in a vindictive prosecution by adding these counts only after he refused to plead guilty. He next argues that he did not commit aggravated identity theft under the interpretation of that offense recently adopted by the Supreme Court in *Dubin v. United States*, 599 U.S. 110 (2023). Both arguments lack merit.

### 1. Vindictive Prosecution

In the lead up to trial, the district court granted a continuance so that the parties could negotiate a plea agreement. Those negotiations failed. At a pretrial hearing, O'Lear rejected the government's plea offer and asked to go to trial. After stating the terms of that offer, the prosecutor informed the court that the government might "supersede the indictment" before the trial "to add aggravated identity theft counts[.]" Tr., R.90, PageID 847. These counts would impose a two-year minimum term of imprisonment to run consecutively to the sentence on the

other charges. *See* 18 U.S.C. § 1028A(a)(1), (b)(2). The prosecutor noted that the government did not seek these new charges "in any way to . . . punish" O'Lear but instead to "present more options to the jury in returning a verdict[.]" Tr., R.90, PageID 847. To ensure that O'Lear knowingly rejected the offer, the court detailed the "much higher sentence" he would face if he was convicted at trial. *Id.*, PageID 849. O'Lear nevertheless reaffirmed that he would like to take his chances with a jury, and the government added the two aggravated-identity-theft counts in a superseding indictment.

O'Lear now argues that the government added these counts to punish him for exercising his right to a jury trial. We normally review a district court's decision to deny this type of vindictive-prosecution claim for an abuse of discretion. *See United States v. Tippins*, 630 F. App'x 501, 503 (6th Cir. 2015). But O'Lear had the duty to raise the claim before trial. Fed. R. Crim. P. 12(b)(3)(A)(iv). And he did not object to the new counts at all in the district court. So we must review O'Lear's claim under the deferential plain-error test. *See United States v. Meda*, 812 F.3d 502, 510 (6th Cir. 2015). He has shown no error, let alone a plain one.

The Fifth Amendment bars the government from "depriv[ing]" defendants of their "liberty" "without due process of law[.]" U.S. Const. amend. V. The Supreme Court has read this text to prohibit prosecutors from punishing defendants for exercising their legal rights. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). When, for example, a defendant invoked a state-law right to a retrial on a misdemeanor charge, the Court held that prosecutors could not retaliate against him by substituting more serious felony charges in response. *Blackledge v. Perry*, 417 U.S. 21, 28–29 (1974). Likewise, we held that prosecutors may not punish defendants for successfully moving to suppress evidence by charging them with more serious offenses. *United States v. LaDeau*, 734 F.3d 561, 566–73 (6th Cir. 2013).

But courts have refused to extend this reading to plea bargaining. When a prosecutor threatens to bring harsher charges if a defendant does not plead guilty, defendants often assert that the prosecutor has unconstitutionally retaliated against them for exercising their right to a jury trial. *See, e.g.*, *Bordenkircher*, 434 U.S. at 358–59. The Supreme Court has rejected these claims. *See id.* at 362–65. It has reasoned that the government does not "punish[]" a defendant

by offering a choice between two options (plead guilty to less serious charges or stand trial on more serious ones) so long as the defendant may voluntarily "accept or reject" this offer. *Id.* at 363. Any other rule would interpret the Due Process Clause to bar plea deals. *See id.* at 364; *see also Goodwin*, 457 U.S. at 378–80. For decades, then, we have rejected vindictive-prosecution claims that rested only on the government's pursuit of additional charges after the parties' plea negotiations broke down. *See United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004) (citing cases); *see also United States v. Hall*, 829 F. App'x 699, 710 (6th Cir. 2020); *United States v. Young*, 847 F.3d 328, 361 (6th Cir. 2017); *Tippins*, 630 F. App'x at 503–04.

This case is comparable. O'Lear identifies only his refusal "to accept a plea bargain" as the purported reason why the government added the two aggravated-identity-theft counts. *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001). Even if we assume the truth of his allegation, O'Lear identifies nothing to suggest that he lacked the free will to "accept or reject" the government's plea offer. *Bordenkircher*, 434 U.S. at 363. So the allegation does nothing to establish a due-process violation. *See id.* at 365.

O'Lear's two responses do not change things. He first claims that his case covers new ground. In prior cases, he alleges, any additional charges after the failed plea negotiations did not increase the defendant's total sentencing exposure. Here, by contrast, the new charges came with a two-year mandatory minimum on top of his sentence for the other counts. *See* 10 U.S.C. § 1028A(a)(1), (b)(2). This argument misreads the prior caselaw. Take *Bordenkircher*. There, the prosecutor offered to recommend a five-year sentence if the defendant pleaded guilty and threatened to add a habitual-offender enhancement that would trigger "a mandatory sentence of life imprisonment" if he did not. 434 U.S. at 358–59. The defendant's refusal to plead guilty produced a life sentence. *Id.* at 359. But the Court saw no constitutional problem with the offer. *Id.* at 362–65. Just as the threat of a mandatory life sentence in that case did not violate due process, neither did the threat of a mandatory two-year sentence in this one.

O'Lear next invokes our decision in *LaDeau*. In that case, however, we held that the government had retaliated against the defendant because he had successfully moved to suppress evidence. *LaDeau*, 734 F.3d at 569. We thus distinguished *Bordenkircher* on the ground that

the defendant's claim in *LaDeau* did not implicate "the plea bargaining process." *Id.* Because O'Lear's claim does implicate that process, it lacks merit under *Bordenkircher* and its progeny.

## 2. The *Dubin* Decision

In *Dubin*, the Supreme Court recently clarified the scope of the statute prohibiting aggravated identity theft. 599 U.S. at 116–32. This statute punishes anyone who, "during and in relation to" several crimes, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person[.]" 18 U.S.C. § 1028A(a)(1). The government in *Dubin* argued that a medical provider had wrongly "used" a patient's identity when the provider overbilled Medicaid for valid services—even though the provider had not lied about the patient's identity. 599 U.S. at 114, 117–18. The Court rejected this argument that the mere use of a patient's name in an overbilling scheme violated § 1028A(a)(1). *Id.* at 132. It instead held that a defendant commits aggravated identity theft only if the unauthorized use of a person's identity is "at the crux of what makes the conduct criminal." *Id.* at 131. And the provider's healthcare fraud in *Dubin* concerned only "*how* and *when*" it provided services, not "*who*" received them. *Id.* at 132.

O'Lear argues that he did not commit aggravated identity theft under *Dubin*'s reading of the crime. We disagree. At the outset, it is not clear that O'Lear timely raised this claim. O'Lear did not assert the claim in his sufficiency-of-the-evidence challenge in the district court or in his appellate briefing. Rather, he first asserted it in a supplemental letter after the parties had completed their briefing, five days after the Supreme Court issued its *Dubin* decision.

In response, O'Lear notes that circuit courts generally must apply the law as it exists at the time of the appeal if the law has changed since the district court's final judgment. *See Henderson v. United States*, 568 U.S. 266, 271 (2013). And a significant change in law may sometimes excuse the failure to timely raise an issue. *See United States v. Yagar*, 404 F.3d 967, 969 (6th Cir. 2005); *see also Cook v. Med. Savings Ins. Co.*, 287 F. App'x 657, 666 (10th Cir. 2008). But *Dubin* did not change our law. When resolving a circuit split about the meaning of the aggravated-identity-theft statute, the Supreme Court sided with a narrower view that we had already adopted. *See Dubin*, 599 U.S. at 117–18, 132 (citing *United States v. Michael*, 882 F.3d

624, 628–29 (6th Cir. 2018)). *Dubin* thus may not justify O'Lear's delay. *Cf. Cook*, 287 F. App'x at 665–67. Because, however, the government did not invoke a forfeiture argument in response to O'Lear's supplemental letter, we will save this forfeiture issue for another day.

Nevertheless, *Dubin* does O'Lear no good on the merits. Like the provider's use of a patient's name in *Dubin*, O'Lear argues that his use of his patients' identities when filing fraudulent healthcare claims was "ancillary" to (not the "crux" of) his fraud. Appellant's Letter 1. But he misrepresents his aggravated-identity-theft convictions. Unlike in *Dubin*, the government did not charge O'Lear with stealing the patients' identities. It alleged that he forged the signatures of a physician and an x-ray technician to make it appear as if these individuals had ordered or conducted the x-rays he billed for. In other words, O'Lear used the identities of these professionals in a "deceptive" way that went to the "crux" of his scheme to bill for fictitious x-rays. *Dubin*, 599 U.S. at 132. *Dubin* thus supports his aggravated-identity-theft convictions.

## C. Sentencing Challenges

O'Lear lastly raises four challenges to his 180-month sentence. He argues that the district court wrongly imposed two sentencing enhancements when calculating his guidelines range as 188 to 235 months' imprisonment. He argues that the court wrongly allowed former employees to testify as "victims" at his sentencing. And he argues that the court did not adequately explain its sentence. If correct, these procedural objections could invalidate O'Lear's sentence and require us to remand for resentencing. *See United States v. Butts*, 40 F.4th 766, 774 (6th Cir. 2022); *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021); *United States v. Brinda*, 851 F. App'x 565, 568 (6th Cir. 2021). But they all lack merit.

### 1. Obstruction-of-Justice Enhancement

O'Lear first challenges the district court's use of the obstruction-of-justice enhancement in U.S.S.G. § 3C1.1. A probation officer recommended this enhancement because O'Lear "lied repeatedly when he testified." PSR, R.61, PageID 607. The district court agreed. It held that O'Lear obstructed justice by testifying that a low-level x-ray technician (Brien Fletcher)

orchestrated the fraud. O'Lear now argues that the court did not make the detailed findings required to impose this enhancement.

As relevant here, the obstruction enhancement tells district courts to increase a defendant's offense level by two if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of" the charged offense. U.S.S.G. § 3C1.1. Section 3C1.1's commentary makes clear that committing "perjury" during the trial qualifies as behavior that obstructs or impedes the prosecution within the meaning of this enhancement. *Id.* § 3C1.1, cmt. n.4(B); *see United States v. Dunnigan*, 507 U.S. 87, 93 (1993). To commit perjury, a defendant must make a false statement under oath, the false testimony must arise from the defendant's "willful intent" rather than a mistaken memory, and the statement must address an issue "material" to the case. *Dunnigan*, 507 U.S. at 94; *see also United States v. Castro*, 960 F.3d 857, 870 (6th Cir. 2020); *United State v. Roberts*, 919 F.3d 980, 990 (6th Cir. 2019).

When a defendant objects to the obstruction enhancement, district courts must follow a specific process if they seek to impose the enhancement on the ground that the defendant lied at trial. *See Dunnigan*, 507 U.S. at 95; *Roberts*, 919 F.3d at 990. The district court must identify—either expressly or by obvious implication—the statements in the defendant's testimony that the court considers perjurious. *See United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997). And the court must make either specific findings that the statements meet each perjury element or a general finding that covers all the specific elements. *See Dunnigan*, 507 U.S. at 95. This process exists to protect a defendant's right to testify at trial. *See id.* at 96–97.

Here, however, O'Lear failed to object to the enhancement in the district court at nearly every opportunity. He did not object to the presentence report's recommendation that the court impose it—a failure that typically permits the court to accept the report's findings without more. *See United States v. Hudson*, 2022 WL 72009, at *1, *4 (6th Cir. Jan. 7, 2022); Fed. R. Crim. P. 32(i)(3)(A). He also did not object at sentencing when the court calculated his guidelines range or when it reiterated that his lies had triggered the enhancement. And he did not object at the end of the sentencing hearing when the court asked if the parties had any further concerns. *See*

*United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc). He thus forfeited his appellate challenge to the enhancement. *See id.*

O'Lear counters that his attorney was in the process of objecting when the court cut him off to highlight that it was applying the enhancement. The record does not support this theory. By the point of the sentencing hearing that O'Lear cites, he had already raised two different objections to the presentence report's guidelines calculations, and the court had ruled on them. The hearing thus had transitioned to the point at which defense counsel may "speak" generally about what sentence is proper under the factors listed in 18 U.S.C. § 3553(a). Fed. R. Crim. P. 32(i)(4)(A)(i). And when the court interrupted counsel to mention the obstruction enhancement, counsel clarified that he had been planning "to talk about the overall [e]ffects of a conviction" on O'Lear and his family. Sent. Tr., R.87, PageID 784–85. Counsel never mentioned the enhancement. He thus failed to "alert" the court that it needed to make the findings that our cases require when a defendant objects. *Hudson*, 2022 WL 72009, at *3. So plain-error review applies. *See United States v. Jallad*, 468 F. App'x 600, 605 (6th Cir. 2012); *United States v. Harbin*, 9 F. App'x 438, 440–41 (6th Cir. 2001) (per curiam).

This change in the standard of review matters. The government usually bears the burden to prove that the enhancement applies. *See United States v. Iossifov*, 45 F.4th 899, 923 (6th Cir. 2022). On plain-error review, however, the burden shifts to the defendant to show that the district court committed an obvious error when applying it. *See United States v. Pina*, 746 F. App'x 440, 444 (6th Cir. 2018); *see also United States v. Simmonds*, 62 F.4th 961, 967 (6th Cir. 2023).

We see no plain error with the court's analysis, notwithstanding O'Lear's claim that the district court failed to make the specific findings required for this enhancement. After all, the court would not have committed an obvious error if it had held that it need not make these findings when the defendant does "not place[]" the court "on notice of the need" for them (as was the case here). *Harbin*, 9 F. App'x at 441. To the contrary, the caselaw includes the caveat that courts must make these findings when "a defendant *objects*" to the enhancement—not when the defendant says nothing about it. *Dunnigan*, 507 U.S. at 95 (emphasis added); *see Castro*, 960 F.3d at 870.

In any event, the district court also did not commit an obvious error by implicitly deciding that its explanation sufficed. The court based the enhancement on the part of O'Lear's testimony implicating Fletcher as the party "involved" in the fraud. O'Lear Tr., R.95, PageID 1632. The court described O'Lear's "story" about Fletcher as the type of "bald-faced lie" that qualified as obstruction. Sent. Tr., R.87, PageID 784. It could reasonably believe that this general description met our requirement to identify the specific parts of O'Lear's testimony that it found perjurious. *See Roberts*, 919 F.3d at 990. And it could reasonably believe that its general description met the Supreme Court's requirement to rule on "all of the factual predicates for a finding of perjury." *Dunnigan*, 507 U.S. at 95. The court found that O'Lear's efforts to shift blame for the fraud were knowingly false, and these efforts were obviously material to whether he committed the fraud.

## 2. Vulnerable Victims

O'Lear next challenges the district court's reliance on the enhancement for crimes that involve "vulnerable victims." *See* U.S.S.G. § 3A1.1. Section 3A1.1(b) instructs district courts to increase a defendant's offense level by two "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim[.]" *Id.* § 3A1.1(b)(1). It then tells courts to add two more levels if "the offense involved a large number of vulnerable victims[.]" *Id.* § 3A1.1(b)(2). The district court applied this enhancement to O'Lear by finding that "the victims of the overall fraud" included the nursing-home residents. Sent. Tr., R.87, PageID 775. It described these residents as "vulnerable" because most were elderly or disabled. *Id.* And because many nursing-home victims existed, the court increased the offense level by four. *Id.*, PageID 775–76.

O'Lear challenges the court's use of this four-level enhancement. He does not now dispute that the elderly or disabled nursing-home patients would qualify as "vulnerable" under our precedent. *See United States v. Ealy*, 682 F. App'x 432, 438 (6th Cir. 2017); *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015). He instead argues that the patients did not qualify as his "victims." According to O'Lear, he victimized only the Medicare and Medicaid programs because they owned the funds that he fraudulently received.

To address his challenge, we begin with our standard of review. We review legal questions (such as questions about the meaning of a term like "victim") under the non-deferential de novo standard. *See United States v. Nash*, 648 F. App'x 589, 591 (6th Cir. 2016); *United States v. Madden*, 403 F.3d 347, 349–50 (6th Cir. 2005). And we review factual questions (such as questions about the conduct that O'Lear engaged in) under the deferential clear-error test. *See United States v. Moon*, 513 F.3d 527, 539–40 (6th Cir. 2008). But what about the "mixed" question of whether the historical facts found by the district court meet our legal test for who qualifies as a "vulnerable victim"? Without expressly addressing this issue, our precedent has treated this mixed question as a fact-bound one subject to clear-error review. *See United States v. Henderson*, 2021 WL 3173261, at *5 (6th Cir. July 27, 2021) (citing *United States v. Stokes*, 392 F. App'x 362, 369 (6th Cir. 2010)); *United States v. Wilson*, 561 F. App'x 451, 452 (6th Cir. 2014); *United States v. Brawner*, 173 F.3d 966, 972 (6th Cir. 1999). This approach comports with the Supreme Court's general instructions to review fact-bound mixed questions of law and fact for clear error. *See United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019) (citing *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 393–94 (2018)). And this deferential test imposes a high bar. We must uphold the district court's ultimate vulnerable-victim finding if the evidence made the finding "plausible"—even if competing evidence would have reasonably permitted a contrary conclusion. *See United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022).

Under this review dichotomy, we must evaluate the following legal question de novo: What does § 3A1.1's text require before a district court may impose a "vulnerable victim" enhancement? Two points about this guideline matter to O'Lear's challenge. For one thing, § 3A1.1 does not contain an express definition of "victim." *Compare* U.S.S.G. § 3A.1.1, *with id.* § 2B1.1 cmt. n.1. We thus have given the word its ordinary, everyday meaning for purposes of this guideline. *See United States v. Webster*, 615 F. App'x 362, 364 (6th Cir. 2015). And an ordinary English speaker would call a person a "victim" if the person has been "tricked, duped, . . . subjected to hardship," or "taken advantage of" by a defendant or if the person has been otherwise "harmed by [the defendant's] crime." *Id.* (first quoting *Webster's Third New International Dictionary* 2550 (rev. ed. 2002); then quoting *Black's Law Dictionary* 1798 (10th

ed. 2014)).  Under this broad definition, a "victim" need not suffer any specific type of financial or physical harm.  *See id.*

For another thing, the Sentencing Commission has gradually expanded § 3A1.1's scope. At one point, our precedent interpreted this guideline to cover only defendants who targeted a victim precisely because of the victim's "vulnerable" state.  *See, e.g.*, *United States v. Smith*, 39 F.3d 119, 124 (6th Cir. 1994).  We also interpreted it to cover only victims of the *specific conduct* that made up the defendant's offense, not any *relevant conduct* related to the offense under U.S.S.G. § 1B1.3.  *See United States v. Wright*, 12 F.3d 70, 73–75 (6th Cir. 1993).  Under this narrow view, the "elements of the offense" limited the eligible "victims."  *Id.* at 74.  So when a defendant stole funds by forging a payee's name on a Treasury check in violation of 18 U.S.C. § 510(a)(2), we treated the bank that lost money as the only victim—not the vulnerable payee who temporarily lost access to the check's funds.  *See United States v. Dixon*, 66 F.3d 133, 135–36 (6th Cir. 1995); *see also United States v. Bondurant*, 39 F.3d 665, 667–68 (6th Cir. 1994).

But the Commission has since amended the guideline to do away with both limits from our earlier caselaw.  *See United States v. Devore*, 2019 WL 11706039, at *5 (6th Cir. Dec. 20, 2019) (order).  Now, a defendant should receive the enhancement if the defendant "knew or should have known" of the victim's vulnerable state—whether or not the defendant targeted the victim because of this state.  U.S.S.G. § 3A1.1(b)(1); *see Brawner*, 173 F.3d at 973.  And now, a defendant can receive the enhancement if the vulnerable victim was harmed by the "relevant conduct" that the defendant engaged in while committing the offense—even if the victim was not harmed by the specific conduct that made up the elements of the offense.  U.S.S.G. § 3A1.1 cmt. n.2; *see United States v. Gawthrop*, 310 F.3d 405, 409–11 (6th Cir. 2002).  This relevant conduct can include, for example, any actions undertaken "during the commission of the offense" or any actions undertaken "to avoid detection" of the offense.  U.S.S.G. § 1B1.3(a)(1).

When combining the ordinary definition of "victim" with the Commission's expansion of § 3A1.1, we have recognized that both indirect and intangible harms can make a person a "victim" of a crime directed at others.  Indeed, we have already concluded as much in a case involving indirect victims of healthcare fraud like O'Lear's.  *See Moon*, 513 F.3d at 541.  In

*Moon*, a jury found a doctor guilty of defrauding a State's Medicaid program by billing for full chemotherapy doses while administering only partial doses to her cancer patients. *Id.* at 532–33. The doctor claimed that the district court wrongly imposed the vulnerable-victim enhancement by finding that her patients had been victims. *Id.* at 540. The Medicaid program qualified as the only "victim" of her fraud, she reasoned, because she had stolen money from it rather than her patients. *Id.* We disagreed, holding that her cancer patients also qualified as victims because the crime had indirectly harmed them. *Id.* at 541. To implement the fraud, the doctor had wrongly given them partial doses of the chemotherapy medication without notice or a medical justification. *Id.* at 541; *see also United States v. Eggleston*, 823 F. App'x 340, 342, 348–49 (6th Cir. 2020).

Intangible harms also can establish "victim" status under § 3A1.1. Defendants often use the personal identifying information of one group (such as the elderly or poor) to take money from another group (such as government agencies or private lenders). They might obtain illegitimate tax refunds by filing false tax returns in the names of individuals whose identities they have stolen. *See Ealy*, 682 F. App'x at 438; *Webster*, 615 F. App'x at 364–65. Or they might obtain unemployment benefits by filing false applications in the names of low-income people whose identifying information they deceptively obtained. *See Nash*, 648 F. App'x at 591. The tax authorities or unemployment agencies suffered the monetary losses in these cases. Yet, even if the individuals whose identities were wrongly used "did not suffer any (known) financial loss," we still treated them as "victims" under § 3A1.1. *Webster*, 615 F. App'x at 365; *see Ealy*, 682 F. App'x at 438; *Nash*, 648 F. App'x at 591. Individuals whose personal information is unlawfully used must spend time and energy dealing with the fallout. *Webster*, 615 F. App'x at 365. Perhaps they must fix the resulting credit problems by creating new financial accounts or spending hours on the phone with credit-reporting agencies. *See id.* Or perhaps they must cooperate with the defrauded agencies or the police to clarify that they were not "in" on the fraud. *See id.*

Other courts have followed the same path. They have agreed that a person whose identity is wrongly used to facilitate a financial fraud against a different party can qualify as a "victim" of that fraud under § 3A1.1. *See, e.g.*, *United States v. Adeolu*, 836 F.3d 330, 332–35 (3d Cir.

2016); *United States v. Myers*, 772 F.3d 213, 216, 220–21 (5th Cir. 2014); *United States v. Bazile*, 590 F. App'x 870, 872 (11th Cir. 2014) (per curiam); *United States v. Stewart*, 33 F.3d 764, 771 (7th Cir. 1994). And they have kept to this rule for fraud schemes (like O'Lear's) that attempt to bilk the Medicare or Medicaid programs of funds. *See, e.g.*, *United States v. Rehfuss*, 810 F. App'x 92, 94–95 (3d Cir. 2020); *United States v. Bergman*, 852 F.3d 1046, 1072 (11th Cir. 2017); *United States v. Bachynsky*, 949 F.2d 722, 735–36 (5th Cir. 1991).

When the district court applied these legal rules to the facts of O'Lear's case, it did not clearly err by finding that the nursing-home residents qualified as victims. *See Henderson*, 2021 WL 3173261, at *5. Admittedly, as in these other cases, government entities (the Medicare and Medicaid programs) suffered the only ("known") monetary losses from O'Lear's fraud. *Webster*, 615 F. App'x at 365. But, as in these cases, O'Lear "misused" the "identities" of "elderly" and "dependent" nursing-home residents to carry out his fraud. Sent. Tr., R.87, PageID 775. Without authorization, he put their personal identifying information (including their "Social Security number") on many claims for imaginary x-rays that his company did not perform. PSR, R.61, PageID 603. The district court could reasonably believe that this improper use of the residents' identities harmed them because of the "significant time involved" disentangling the fraud and stopping any negative effects on their lives that followed from it. *Webster*, 615 F. App'x at 365.

If anything, this healthcare case involved more than just that sort of harm. O'Lear also improperly disclosed the real x-rays of real patients by placing them in fictitious claims files in an attempt "to avoid detection" of his fraud when his company was audited. U.S.S.G. § 1B1.3(a)(1). As the district court explained, the disclosure of this private information contained "revealing" x-rays of the residents. Sent. Tr., R.87, PageID 775. If these residents were not victims, we would risk concluding that the improper disclosure of private health information amounts to a victimless violation of federal law. *See* Health Insurance Portability and Accountability Act (HIPAA), Pub. L. No. 104-191, § 264, 110 Stat. 1936, 2033–34 (1996); 45 C.F.R. § 164.502.

In response, O'Lear distinguishes our *Moon* opinion on the ground that the patients in that case suffered a physical harm. The defendant's fraud led the patients to receive only partial

doses of a potentially "life-saving chemotherapy medication[.]" 513 F.3d at 541. O'Lear's fraud, by contrast, did not cause similar physical injuries. True enough. But *Webster* clarified that the unauthorized use of a person's identity "itself causes harm." 615 F. App'x at 365. And while that case involved tax fraud, we fail to see why a different rule should apply in this healthcare context. *See Rehfuss*, 810 F. App'x at 93–95. O'Lear suggests that the district court in *Webster* found as a fact that the individuals there suffered some of the harms that we hypothesized—such as the need to get new bank accounts or deal with the authorities. Yet *Webster* said no such thing. *See* 615 F. App'x at 365. Rather, it used those examples of the harms that can flow out of identity theft as a basis for its general conclusion that individuals whose information is wrongfully used to commit fraud are also victims of that fraud. *Id.* The same rule applies here—or at least the district court could reasonably so conclude.

O'Lear alternatively argues that the district court failed to explain why his fraud involved a "large number" of vulnerable victims—the finding that added an additional two levels to his offense level under § 3A1.1(b)(2). He points out that the court stated only that the victims "included many individual" nursing-home residents without identifying a precise number. Sent. Tr., R.87, PageID 775. Yet O'Lear's presentence report explained that he used the identifies of "at least 62" patients (and "possibly" as many "as 605" patients) to file fraudulent claims with the Medicare and Medicaid programs. PSR, R.61, PageID 603–04. In the district court, moreover, he did not object to this factual assertion; rather, he argued only that these patients should not qualify as "vulnerable" or as "victims." Mem., R.63, PageID 658–59. The district court thus could treat this unobjected-to portion of the presentence report "as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A); *Hudson*, 2022 WL 72009, at *3–4. And O'Lear does not dispute that 62 victims would suffice to qualify as a "large number" under § 3A1.1(b). So the court had an adequate factual basis to apply this additional two-level enhancement.

### 3. Victim Testimony

Having exhausted his guidelines arguments, O'Lear turns to challenging the district court's conduct at sentencing. He argues that it wrongly allowed two of his former x-ray technicians to give statements as "victims." One of the technicians testified at trial that O'Lear forged her name during the fraud. At sentencing, she described the harm that his conduct had

caused, noting that he had "jeopardized [her] radiology licensure that [she] worked so hard for." Sent. Tr., R.87, PageID 777–78. The other technician spoke at sentencing about the dangerous conditions in which O'Lear forced her to work. He did not properly maintain the vans that technicians drove to appointments. They, for example, had to drive "without heat" in the winter, and some vans contained such large "rust holes" that mice could get in. *Id.*, PageID 779. O'Lear also refused to give this technician a proper lead apron to wear when she became pregnant.

On appeal, O'Lear claims that these technicians did not qualify as "victims" and thus that the court could hear their statements only under oath and subject to his cross-examination. Yet he did not raise any challenge to the technicians' statements at sentencing. So we again must review this claim for plain error. *See Vonner*, 516 F.3d at 386; *see also United States v. Grigg*, 434 F. App'x 530, 533 (6th Cir. 2011).

District courts have broad discretion at sentencing to consider any "information" about the defendant's "background, character, and conduct" that they find helpful for choosing the sentence. 18 U.S.C. § 3661; *see Concepcion v. United States*, 597 U.S. 481, 486 (2022). The Federal Rules of Evidence also do not apply at this stage. *See* U.S.S.G. § 6A1.3(a). Courts thus may consider hearsay as long as it meets a relatively modest "reliability" bar—even though the defendant cannot cross-examine the hearsay declarant. *See United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019).

Yet district courts do not have unlimited discretion. They *must* consider some information. The Federal Rules of Criminal Procedure make clear that courts "must permit" all victims "to be reasonably heard" at sentencing. Fed. R. Crim. P. 32(i)(4)(B), 60(a)(3). In the Crime Victims' Rights Act, Congress also gave victims a right "to be reasonably heard" at this time. 18 U.S.C. § 3771(a)(4). The Act defines "crime victim" as anyone "directly and proximately harmed as a result of" the defendant's offense. *Id.* § 3771(e)(2)(A). Courts have read this statute as allowing victims to give unsworn statements at sentencing. *See Grigg*, 434 F. App'x at 533–34.

Under these standards, the district court did not commit an obvious error by allowing the two technicians to give their statements. The first technician discussed the impact of O'Lear's

decision to forge her name during his fraud. The district court could reasonably conclude that the harms she incurred as a result of O'Lear's identity theft made her a "victim" of his fraud within the meaning of § 3771(e)(2)(A). The court thus did not plainly err by allowing her to give an unsworn statement that was not subject to his cross-examination. *See Grigg*, 434 F. App'x at 533–34; *see also United States v. Green*, 718 F. App'x 141, 142–43 (3d Cir. 2018).

The second technician discussed the working conditions to which O'Lear exposed her. Whether she qualified as a "victim" of his fraud is debatable and ultimately does not matter. As we explained in another case, this question might have mattered if the court had barred this technician from speaking. She might have then asserted that the court violated her rights under the Crime Victims' Rights Act. *United States v. Leach*, 206 F. App'x 432, 435 (6th Cir. 2006); *see In re Rendon Galvis*, 564 F.3d 170, 175–76 (2d Cir. 2009) (per curiam). But the court allowed her to speak. And O'Lear concedes that her statement had relevance to his "character" and "conduct." 18 U.S.C. § 3661. Even if the second technician did not qualify as a victim under § 3771(e)(2)(A), therefore, the court could still consider her information when choosing O'Lear's sentence. *See Leach*, 206 F. App'x at 435; *see also United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010) (per curiam).

O'Lear responds that he would have had the right to "cross-examine" this technician if the court had not treated her as a victim. Appellant's Br. 32. But he never even asked to cross-examine her. *See Myers*, 402 F. App'x at 845. O'Lear also fails to identify the source of any such right. The Confrontation Clause does not apply at sentencing. *See United States v. Paull*, 551 F.3d 516, 528 (6th Cir. 2009); *see also Green*, 718 F. App'x at 142. And O'Lear does not identify any other statute or rule that allows him to cross-examine any "non-victim" who provides information that the court considers at sentencing. He thus has shown no plain error in the court's decision to consider the unsworn statements from these two technicians. *See Vonner*, 516 F.3d at 386.

### 4. Adequate Explanation

O'Lear lastly argues that the district court did not adequately explain why its 180-month sentence comported with the sentencing factors in 18 U.S.C. § 3553(a). He is correct that a

district court must identify the "reasons" for its sentence. 18 U.S.C. § 3553(c). But this mandate does not compel a court to issue a written decision "in every case." *Rita v. United States*, 551 U.S. 338, 356 (2007). Nor must the court provide a lengthy explanation on the record or engage in a mechanical recital of the § 3553(a) factors. *See United States v. Aguilar-Andres*, 780 F. App'x 231, 234–35 (6th Cir. 2019) (citing *United States v. Wilms*, 495 F.3d 277, 280 (6th Cir. 2007); *United States v. Trejo-Martinez*, 481 F.3d 409, 413 (6th Cir. 2007)). Rather, it need only show that it "considered the parties' arguments and has a reasoned basis" for its sentence. *Rita*, 551 U.S. at 356. And because O'Lear did not object to the court's explanation at the end of his sentencing, the plain-error test again applies. *See United States v. Nunley*, 29 F.4th 824, 833 (6th Cir. 2022). We thus may reverse only if its explanation was so deficient as to qualify as obvious error. *See Vonner*, 516 F.3d at 386.

Under this plain-error test, we have "affirmed far less thorough explanations" than the one that the district court offered here. *Nunley*, 29 F.4th at 834 (citing *Vonner*, 516 F.3d at 386–88). The court calculated O'Lear's guidelines range as 188 to 235 months' imprisonment. Sent. Tr., R.87, PageID 776; 18 U.S.C. § 3553(a)(4)(A). It then chose the sentence based on the fact that O'Lear had been behaving as "two different people" in his life. Sent. Tr., R.87, PageID 804. On the one hand, he had done a lot of "bad things" while running his business. *Id.*, PageID 805. He had deprived taxpayers of millions of dollars and victimized "elderly" and "disabled" individuals. *Id.*; *see* 18 U.S.C. § 3553(a)(1). As a result, the court needed to "deter" (and "punish") this fraud. Sent. Tr., R.87, PageID 805; *see* 18 U.S.C. § 3553(a)(2)(A)–(C). On the other hand, his "family members and friends" had provided statements showing him to be a caring family man. Sent. Tr., R.87, PageID 804; *see* 18 U.S.C. § 3553(a)(1). Given this conflicting evidence, the court opted for a below-guidelines sentence of 180 months. Contrary to O'Lear's claim, we can neatly "map" the various § 3553(a) factors onto the district court's reasoning. *Aguilar-Andres*, 780 F. App'x at 235. It thus did not commit plain error in explaining the sentence.

We affirm.