**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenneth H. CLARK, Sr., Defendant–Appellant.**

**No. 00–1743.**

United States Court of Appeals, Sixth Circuit.

Dec. 14, 2001.

Before BOGGS and GILMAN, Circuit

Judges; and QUIST, District Judge.*

PER CURIAM.

Clark appeals his conviction on two counts of mail fraud, in violation of 18 U.S.C. § 1341, and two counts of health care fraud, in violation of 18 U.S.C. § 1347. Clark, operating as W.G. Clark Counseling Center, is alleged to have fraudulently billed Medicare and Blue Cross/Blue Shield of Michigan ("BCBS") for substance abuse counseling he did not perform.

On appeal, Clark makes six arguments: (1) that the district court erred in permitting inadmissible prior bad acts evidence; (2) that the court erred in permitting additional prejudicial evidence; (3) that the prosecutor knowingly misled the jury with a false statement in his closing argument; (4) that the court erred in denying Clark an adjournment at the start of his trial and denying him permission to fire his attorney; (5) that there was insufficient evidence to convict Clark on the two charges related to BCBS; and (6) that the court erred in sentencing Clark by increasing his base offense level for obstruction of justice. For the reasons set forth below, we affirm Clark's convictions and sentence.

## I

Clark, a former Detroit police officer, incorporated and operated W.G. Clark Counseling Center, which held itself out as providing substance abuse counseling. The Center registered with Medicare and with BCBS, submitting documentation stating that two medical doctors, Carl Fowler and James Beale, and a psychiatric social worker, Valerie Sanford, would be providing the services. All three of these individuals have since testified that they did not work with the Center, that their information was used fraudulently, and that their signatures on the registration documents were forged.

In 1996 and 1997, Clark submitted to Medicare and BCBS bills totaling in excess of three hundred thousand dollars. With regard to the Medicare submissions, the government presented the testimony of Medicare recipients for whom bills for treatment were submitted. Each of the recipients testified either that they had never been treated at the Center or that they were treated fewer times than indicated on the submitted bills. With regard to the BCBS submissions, Clark submitted bills for services provided by physicians who evidence showed had not provided the claimed services.

Clark's principal defense was that, since he did not understand the billing procedures of the two insurers, he relied on a man named Ron Hawkins to do his billing. Hawkins worked at Lifeline, a Chicago-based substance treatment center, and Clark alleged that Hawkins combined Clark's billing with his own. According to Clark's defense, Hawkins would submit both sets of bills under Clark's business name; Clark would then deposit the insurers' checks and pay to Hawkins in cash the portion of each check that Hawkins would tell Clark represented Hawkins's billings.

Clark's trial was initially scheduled to begin on January 26, 1999. Clark requested and received two adjournments, and then discharged his retained lawyer and requested court-appointed counsel. Clark then requested, and was denied, another adjournment, and trial began on August 31, 1999. On the first day of trial, Clark moved to discharge his court-appointed attorney, and the court denied his motion.

---

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

Clark was convicted on all four counts and was sentenced to concurrent terms of 30 months of imprisonment on each count, to be followed by three years of supervised release; he was also ordered to pay $324,413.55 in restitution.

Clark now appeals various rulings and actions of the district court and the prosecutor during and after his trial. Clark argues that in two separate instances the court impermissibly permitted the introduction of prejudicial evidence, that the prosecutor committed misconduct by knowingly misleading the jury in his closing argument, that the court erred in denying his last-minute motion for an adjournment or alternatively his motion for new counsel, that there was insufficient evidence to support one of his convictions, and that the court erred in sentencing him.

## II

*The Prosecution's Cross–Examination of Clark with Regard to his Polygraph Business*

In his trial testimony, Clark testified at length regarding his 13–year career as a Detroit police officer, discussing the specialized training he had received as an officer, the units he had worked in, and how he had used his police training to begin operating a polygraph business on the side while still an officer. The prosecution then cross-examined Clark about his polygraph business, asking whether the Chief of Police had ordered him at one point to stop conducting criminal polygraphs as part of his business. Clark initially answered, "[n]ot exactly," but when presented with a transcript of his police disciplinary hearing for his actions, Clark admitted to being ordered to cease conducting criminal polygraphs but having continued to do so in violation of the order.

Defense counsel objected to this cross-examination at trial, but the court allowed it under Federal Rule of Evidence 404(a)(1) (allowing an exception to the general rule that character evidence is inadmissible in cases where "[e]vidence of a pertinent trait of character [is] offered by an accused, or by the prosecution to rebut the same"). Clark now argues that his ruling was incorrect and that the admission of this testimony prejudiced him.

The government argues that the subject of Clark's polygraph business was proper under the Federal Rules of Evidence because Clark had already put his character at issue through his testimony and that of one of his witnesses. First, the government argues that by testifying about his experience, training, and various positions as a police officer and how he used his police training to start the polygraph business while still an officer, Clark opened the door for questions about his record as a police officer and the legitimacy of his polygraph business. Additionally, prior to his testimony, Clark called FBI Special Agent David Hervey to testify that Clark had once reported possible corruption in city contracts and had assisted in the investigation of this report by wearing a recording device to a meeting with a city official. In response to a prosecution objection on relevancy grounds, defense counsel stated that the testimony was to elicit character evidence showing Clark's honesty (apparently to draw an inference that the FBI trusted Clark's honesty enough to use him in an investigation). The government contends that, having put his own honesty at issue, the Federal Rules allow "the prosecution to rebut the same." FED. R. EVID. 404(a)(1).

■ Under Rule 404(a)(1), "evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same" is admissible. FED. R. EVID.

404(a)(1). It is well-settled that "[o]nce the defendant has 'opened the door' by offering evidence as to his good character, the prosecution may rebut that evidence." *United States v. McGuire,* 744 F.2d 1197, 1204 (6th Cir.1984). As the Supreme Court has written of a defendant who presents good character evidence by opinion testimony, "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson v. United States,* 335 U.S. 469, 479, 69 S.Ct. 213, 93 L.Ed. 168 (1948). So, "while the law gives [the] defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans." *Id.* Though he asserts otherwise in his brief to this court, Clark clearly put his character at issue through both Agent Hervey's and his own testimony. The question, then, is whether eliciting information about the police disciplinary action fairly rebuts Clark's evidence.

Clark called Agent Hervey expressly to serve as a character witness to show Clark's character for honesty. Therefore, as discussed above, the prosecution was permitted to rebut that evidence either by calling additional witnesses or by cross-examination. In its brief to this court, the government claims that the cross-examination of Clark, eliciting testimony about the police disciplinary proceedings and Clark's actions regarding his polygraph business, was permissible as a rebuttal of Clark's evidence of his honesty.

It is not entirely clear that this is correct. It is undisputed that the government's rebuttal evidence must speak to the character trait set out by the defendant.

*See* FED. R. EVID. 404(a)(1) (allowing "the prosecution to rebut the same"). It may be that Clark having run a polygraph business performing criminal polygraphs in contravention of police rules and of an express order by the Chief of Police speaks to his honesty. However, the government did not point out in the cross-examination the relevance of this testimony to Clark's honesty; the testimony elicited showed only that Clark was ordered not to run the business as he did and that he continued despite the order.

However, a review of the record does not make it entirely clear that the trial court permitted the polygraph cross-examination to rebut Clark's evidence of his character for honesty. Though also referencing Agent Hervey's honesty testimony, the court said of the objected-to polygraph questioning, "[t]his goes directly to his direct testimony. It goes to his character and I'm going to permit it." If viewed as general character evidence introduced to rebut Clark's extensive testimony about his police career and the polygraph business which grew out of his specialized police training, the cross-examination was permissible in that it spoke directly to the general good character evidence set out by the defendant.

On the topic of character evidence, this court has written:

> It is well settled law that in a criminal case the defendant's general character cannot be attacked by the Government unless evidence as to his good character is first introduced by the defendant. Accordingly, if the defendant calls character witnesses who testify to his good character in general, the Government can meet this evidence by the introduction of witnesses who contradict such testimony.

*United States v. Walker,* 313 F.2d 236, 238 (6th Cir.1963).

■ Since this rule certainly applies to character evidence offered by the defendant himself, in addition to that introduced by defense witnesses, the government can act to contradict general character evidence offered by a defendant. Further, though Clark claims that he did not introduce character evidence through his testimony about his police career, it is clear from a review of the record that this was its effect. Therefore, the prosecution's cross-examination on the facts surrounding the polygraph business that Clark had already testified to as part of his police career testimony properly rebutted the general character evidence implicit in Clark's testimony. This is proper because, "once a defendant has raised a particular subject in his or her testimony, ... defendant has opened the door, and testimony of both a general and specific nature may be elicited to provide a complete picture of the subject raised by the defendant." 2 Jack B. Weinstein & Margaret B. Berger, *Weinstein's Federal Evidence* § 404.11[2][b] (2d ed. 2001).

■ Finally, even if we were to find that the district court abused its discretion in allowing the polygraph cross-examination, this court has held that errors with respect to the admission of evidence are subject to harmless error analysis. *See United States v. Daniel,* 134 F.3d 1259, 1262 (6th Cir.1998). Further, it is well settled that an error not of constitutional dimension is harmless "unless it is more probable than not that the error materially affected the verdict." *United States v. Fountain,* 2 F.3d 656, 668 (6th Cir.1993); *United States v. Martin,* 897 F.2d 1368, 1372 (6th Cir.1990) ("Where an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict."). A review of the record makes it clear that the challenged line of questioning could

not have been significantly prejudicial to Clark, as it was not dwelt on, emphasized, or otherwise relied on by the prosecution. As such, it is impossible to say that it more likely than not affected the verdict.

### The Prosecution's Cross–Examination of Clark with Regard to Cash Receipts Clark Kept for Restaurant Meals

■ During cross-examination, the prosecution asked Clark about receipts he kept for business meals at the Excalibur, a restaurant that Clark claims in his brief is "a fancy, expensive restaurant." Defense counsel objected to the questioning at trial on relevancy grounds, but was overruled. On appeal, Clark claims that the line of questioning violated his due process rights because it was not relevant, was more prejudicial than probative, and was improper character testimony. This argument is without merit.

In support of his argument, Clark quotes a portion of the trial transcript in which the government, having entered into evidence books of business receipts kept by Clark, asks Clark about a receipt for a one hundred and six dollar meal at the Excalibur. Clark claims that this line of questioning was irrelevant and used only as character evidence, intending to engender animus against him on the part of the jury by showing him to have led an extravagant lifestyle.

Clark fails to mention in his argument the context in which the government asked about the receipt. Clark's defense to the charge that he defrauded Medicare and BCBS was that he relied on Ron Hawkins to submit his billings and that he paid the portion of each incoming check that represented Hawkins's billings to Hawkins. Clark claimed to have paid Hawkins, in cash, whatever amounts Hawkins claimed as belonging to him, without keeping any record of the payments. The government,

by submitting into evidence Clark's business receipt books and questioning Clark about the receipts he kept for one hundred dollar meals, sought to use Clark's practice of keeping careful business records as evidence to impeach Clark's claim that he had paid out hundreds of thousands of dollars to Hawkins in cash without keeping records of the payments. With this context in mind, it is clear that the prosecution's reference to the carefully-kept restaurant receipt was relevant and had nothing to do with character evidence. It is therefore clear that Clark's argument on this score must be rejected.

### Alleged Prosecutorial Misconduct in the Closing Argument

■ In his closing argument to the jury, the prosecutor, referring to the large cash payments Clark claimed to have made to Hawkins out of his business account, said, "[a]nd if you look at the bank records or whatever accounts you want to look at, you're not going to see large cash withdrawals to make these payments." Clark claims that the prosecutor knew this statement to be false, and intentionally used it to mislead the jury into improperly convicting him. This argument, too, is without merit.

To support his claim, Clark points to an exchange before the grand jury between the same prosecutor and an FBI agent who had investigated Clark's business. In the exchange, the prosecutor asked the agent whether the Center's bank statements showed many "significantly large cash withdrawals," and the agent replied that it did. According to Clark's argument, since the prosecutor was involved in this exchange, he knew the statement he made in his closing argument to be false and misleading.

In support of his argument, Clark cites case law for the proposition that the "de-liberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Though an accurate statement of the law, Clark does not prove any "deliberate deception" on the part of the prosecutor. To the contrary, when one looks at the context, it becomes clear that there was no deliberate deception. First, all of the records to which the prosecutor referred were in evidence in the case, and therefore were available to the jury to check for themselves (which is precisely what the prosecutor asked the jury to do in the challenged statement). In addition, the phrases in question "large cash withdrawals" and "significantly large cash withdrawals" are open to individual interpretation and what one person considers large or significant another may not. It is therefore clear that the prosecutor did not commit misconduct by deliberately misleading the jury.

### The Trial Court's Denial of Clark's Last Motion for a Continuance and Clark's Second Motion to Replace his Counsel

In his fourth argument, Clark contends that the district court abused its discretion in not granting Clark his final continuance or his final request for the appointment of new counsel. In support of this argument, Clark points out that the government did not provide defense counsel with a witness list until August 26, just days before Clark's August 31 trial. As a result, Clark claims that his counsel did not have time to explore the background of witnesses that Clark believed to have mental disabilities.

■ In order for this court to find reversible error in a trial court's decision not to grant a continuance, Clark must show "actual prejudice" resulting from the denial. This requires a "showing that a

continuance would have made relevant witnesses available or added something to the defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir.1997), *cert. denied*, 522 U.S. 1130, 118 S.Ct. 1082, 140 L.Ed.2d 139 (1998); *accord United States v. Crossley*, 224 F.3d 847, 855 (6th Cir.2000). Clark does not allege that new witnesses would have become available, and he does not sufficiently show how the denied continuance would have added something to his defense.

First, from a practical perspective, Clark had a great deal of time to prepare a defense, having been granted several continuances and one change of attorney. Clark was arraigned in November 1998, with a trial date initially set for January 26, 1999. The trial was reset for March 2, 1999, and then Clark was granted his first continuance, putting the date off until May 4, 1999. On April 28, Clark requested and was appointed new counsel, and the court date was put off again. Then, on June 17, 1999, the case was adjourned at Clark's request until August 31, 1999. It was on this date that the trial court denied Clark's motions seeking first a continuance and then, alternatively, new counsel. Clark cites case law for the proposition that, while normally continuances are within the discretion of trial courts to grant or deny, this discretion is abused if a court shows "a myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Based on the repeated delays granted to Clark, it is clear that this case does not illustrate such an insistence.

Clark alleges, however, that the problem was not the total time he had to mount a defense, but the time between the prosecution turning over its witness list and the beginning of trial. Clark admitted in arguing the motion before the trial court that the prosecution's timing was permissible under local court rules. However, in his Rule 29 motion making the same argument, Clark's attorney claimed that a lapse of ten days between the defense requesting the list and the prosecution turning it over prejudiced the defense because it left insufficient time to check the mental health background of the witnesses.

It is difficult to see how this argument has merit. First, as the trial judge pointed out when hearing the motion, the nature of the charges against Clark was such that the witnesses would necessarily be current or former drug addicts. As such, it should hardly have been surprising to Clark that the witnesses at his trial would have mental health (specifically substance abuse) problems. Indeed, if Clark had been treating these witnesses as his billings reflected, he would have extensive knowledge (and records) about their backgrounds. Further, defense counsel had ample opportunity to—and repeatedly did—cross examine the witnesses on their substance abuse and mental health conditions. It is therefore difficult to see how Clark was prejudiced in this respect.

Finally and most importantly, Clark's defense did not rely on the impeachment of the witnesses in question. Each of the witnesses at issue testified that they had been to the Center, if at all, fewer times than submitted for billing to the insurers. Clark's defense did not rely on proving these witnesses wrong; instead of arguing that fraud did not occur with respect to these witnesses, Clark's defense was that it was not he that committed the fraud that occurred. As such, Clark did not need to impeach these witnesses with the mental health backgrounds he should already have known about, and he therefore cannot show prejudice in not having more time to research those backgrounds.

Because Clark had no sufficient basis for requesting a continuance on the day of trial, he also had no basis for his alternative motion for appointment of new counsel, which relied on the same argument. As such, it is impossible to find that the trial court erred in denying this motion as well.

### Clark's Challenge to the Sufficiency of the Evidence Supporting the BCBS Convictions

■ Whereas the government relied on the testimony of purported patients in showing that Clark had defrauded Medicare, it called no such witnesses in making its case regarding BCBS. In Clark's fifth argument to this court, he claims that, because of this, the government failed to prove that the billings with respect to BCBS were false, and therefore, there was insufficient evidence to support his conviction on the BCBS counts.

■ At the outset, it should be noted that, while Clark made a Rule 29 motion for judgment of acquittal at the close of the government's case, he failed to renew that motion at the close of all of the evidence. This court has held that "[t]o protect the issue of sufficiency of the evidence a defendant must move for a judgment of acquittal under Rule 29 both at the close of the government's case and at the close of all of the evidence." *United States v. Dandy*, 998 F.2d 1344, 1356 (6th Cir.1993), *cert. denied*, 510 U.S. 1163, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994). Having not done so, Clark is entitled to reversal on appeal only in the case of a "manifest miscarriage of justice." *United States v. Williams*, 940 F.2d 176, 180 (6th Cir.1991). This has been interpreted to require that the record be "devoid of evidence pointing to guilt." *United States v. Price*, 134 F.3d 340, 350 (6th Cir.1998) (quoting *United States v.*

*Robles–Pantoja*, 887 F.2d 1250, 1254 (5th Cir.1989)).

While it is true that the government did not present direct, testimonial evidence of supposed patients to show that the services billed were never provided, it is certainly not the case that no evidence was presented to support the contention that the billings were fraudulent. The government presented testimony by the doctors and others to the effect that all of the signatures of medical providers on the Center's registration statement were forgeries. Having established by testimony that all of the doctors allegedly affiliated with the Center were not so affiliated, the government's evidence showing that most of the billings in question were for services performed by doctors provides evidence of fraud. Additionally, the government presented the testimony of clerical workers in the Center, each of whom stated that the Center saw almost no patients. The government also put into evidence that, upon searching the Center, authorities found only one filing cabinet with patient records. A BCBS doctor who reviewed these files testified that the records did not support the billings that were submitted for the patients represented by the files.

Though it could be said that the government's case against Clark on the BCBS counts would have been strengthened by the direct testimony of supposed patients, it is impossible to say that there was insufficient—let alone no—evidence to support the conviction.

### The Trial Court's Increase of Clark's Base Offense Level for Obstruction of Justice

■ Paragraph 17 of the Presentence Report prepared in Clark's case recommends an adjustment for obstruction of justice based on several actions by Clark. Among other assertions, the paragraph

states: "The defendant impeded or obstructed justice or attempted to impede or obstruct justice, in that he perjured himself during his trial and provided false statements during the investigation of this case." During the sentencing hearing, the trial judge specifically stated that Clark had committed perjury, at the very least, in his testimony regarding the genuineness of the three signatures on the Center's registration forms filed with the insurers. As the judge pointed out, there was evidence that each of the signatures was forged. The judge then went on to affirm, in response to a question by defense counsel, his finding that the obstruction adjustment followed from this finding of perjury.

Under the United States Sentencing Guidelines, a trial court is obligated to increase a defendant's offense level by two levels if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." *See* USSG § 3C1.1. Further, the commentary to the Guidelines lists "committing, suborning, or attempting to suborn perjury" as an example of the type of conduct intended to warrant the adjustment. USSG § 3C1.1, comment. (n.4(b)).

Clark argues that the judge erred in applying the adjustment for obstruction of justice; however, his argument is frivolous. In his brief to this court, Clark attempts to disprove each of the listed potential bases for the obstruction adjustment. However, the only basis the judge discussed was Clark's perjury, and—as USSG § 3C1.1, comment. (n.4(b)) reads—this was enough for a finding that the adjustment applied.

■ On the perjury issue, Clark cites cases for the proposition that merely denying guilt is insufficient for an obstruction adjustment based on perjury. *See United*

*States v. Dover,* No. 97–2044, 1999 WL 1204794 (6th Cir. Dec. 7, 1999); *United States v. Johns,* 27 F.3d 31, 35 (2d Cir. 1994). It is true that merely denying guilt is not sufficient for the obstruction adjustment. However, as the commentary to the Guidelines points out, the "denial of guilt under oath ... constitutes perjury," which of course is intended to lead to an obstruction adjustment. USSG § 3C1.1, comment. (n.2). As the Supreme Court has held, "[a] witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *See United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Clark's testimony was made up of more than just general denials or statements resulting from some mistake; he testified under oath to specific material untruths, which constitutes perjury.

■ Clark also argues that the court failed to find specific instances of perjury justifying the adjustment. He is correct on the law, as this circuit has stated that "in the usual case the sentencing court must identify particular examples of the defendant's untruthful testimony upon which it bases the § 3C1.1 enhancement." *See United States v. Sassanelli,* 118 F.3d 495, 501 (6th Cir.1997). However, the trial court did explicitly find that Clark had committed perjury and listed as an example his testimony regarding the signatures on the Center's registration documents. The judge seemed to suggest that there were other bases for a finding of perjury, but at the least the judge specifically pointed out the testimony regarding the registration signatures.

### III

Having found that all of Clark's arguments to this court lack merit, Clark's

convictions and sentence are hereby AF-FIRMED.