RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SIR MAEJOR PAGE,

*Defendant-Appellant*.

No. 24-3871

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:21-cr-00157-1—Jeffrey James Helmick, District Judge.

Argued: December 11, 2025

Decided and Filed: December 30, 2025

Before: MOORE, THAPAR, and RITZ, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Segev Phillips, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Segev Phillips, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

THAPAR, Circuit Judge. In summer 2020, Sir Maejor Page raised hundreds of thousands of dollars through a Facebook page he created for Black Lives Matter of Greater Atlanta. Donors thought Page was using their funds to support protests. But in reality, he spent

the money on a prostitute, guns, booze, tailored suits, and a new house.  As a result, Page was convicted of wire fraud and money laundering.  On appeal, he challenges both his conviction and sentence.  Because none of his arguments has merit, we affirm.

I.

A.

In 2014, Sir Maejor Page lived in Atlanta, Georgia, where he participated in various activist movements.  Around that time, he became interested in helping set up a local Black Lives Matter chapter.  But Page soon grew disillusioned with the group due to differences of opinion.  So Page created his own organization called Black Lives Matter of Greater Atlanta (BLMGA).  He wanted to focus both on protesting "in the street[,] shutting stuff down, block[ing] intersections off, stopping the traffic" and on presenting "policy and legislation."  R. 147, Pg. ID 3977.  To help get this new organization off the ground, Page created a Facebook page for BLMGA.  He incorporated the group as a nonprofit with the State of Georgia.  He filed for tax-exempt status with the Internal Revenue Service (IRS).  And he opened a bank account for BLMGA.

The upshot of all these efforts?  Page was able to use BLMGA's tax-exempt status to receive donations through Facebook's "Fundraisers" feature, which allows users to raise money from their friends.  Users might, for example, start fundraisers for their birthdays.  They could then choose whether to raise money for themselves or for a nonprofit.  If they chose the latter option, Facebook provided a searchable list of all registered tax-exempt organizations.  And if users typed in "Black Lives Matter," the first option that appeared was BLMGA.

Despite these early efforts to set up BLMGA, Page didn't file certain tax forms for three consecutive years.  So in 2019, the IRS revoked BLMGA's tax-exempt status.  Nine months later, Page sent a message to Facebook from his personal account stating that BLMGA was no longer a tax-exempt organization and requesting to cancel all donations and fundraisers.  Facebook then asked for some additional information about BLMGA to process Page's request.  But Page never provided that information.  As a result, BLMGA remained listed as a nonprofit and continued to receive small donations every month, usually a few hundred dollars.

But that slow trickle of donations turned into a heavy stream following the death of George Floyd.  Between May and September 2020, more than $490,000 in donations flowed into BLMGA's account.  Although Page had pinned a notice on BLMGA's page that the organization was no longer tax exempt or registered with the State of Georgia, the notice simultaneously told Facebook users that BLMGA was still a "grassroots organization that exposes injustice."  R. 144, Pg. ID 3454.  In fact, when Facebook users asked Page how he would use their donations, he reassured them that BLMGA would use the funds for "equipment, protest gears, food, snacks, drinks, attorney fees, tents, sunscreen, bonding people out of jail, et cetera."  R. 143, Pg. ID 3309.  Page was emphatic that his use of the funds was "not personal" but rather "for the movement."  *Id.* at 3310.

Despite these reassurances, some Facebook users became skeptical of BLMGA.  One user accused the organization of being a "for-profit website media company."  *Id.* at 3324.  But Page remained steadfast, responding, "We aren't for-profit.  We are grassroots."  *Id.*  Likewise, when one user questioned BLMGA's loss of tax-exempt status, Page publicly clarified, "You can send donations. . . . [T]hey just aren't tax exempt.  Funds will be used to help protest in other needed markets."  *Id.* at 3325.  And when another user asked if BLMGA was connected to Black Lives Matter Atlanta, Page simply replied, "We will be using funds to fight for justice for George Floyd" and "[t]o organize protests in other markets."  *Id.* at 3320.

These Facebook users were right to be skeptical.  Page didn't use the funds to fight for justice for George Floyd.  Nor did he use the funds to purchase protest supplies.  Instead, he went on a spending spree, using the donated funds to line his own pockets.  Page started off rather modestly.  He spent BLMGA funds at a bowling alley, lounge, bar, restaurant, grocery store, and guitar store.  But as BLMGA raked in more and more donations, Page's purchases became more and more lavish.  For example, he spent $2,000 on tailored suits and other menswear.  And then he went big.  He used over $108,000 from the BLMGA account to purchase a house in Toledo, Ohio.  He bragged to his friends that he "bought a big ass crib[]" and invited them to "[c]ome see my new house," which he described as "huge" and a "mini mansion."  *Id.* at 3374–76.  But Page still wasn't satisfied.  So he spent $15,000 on home renovations, purchased $1,000 in new appliances, and sought an estimate to install a pool.

And that's not all.  In August 2020, Page used $300 of the BLMGA donations to hire a prostitute.  When the prostitute arrived at his hotel, Page recorded their conversation.  She told him that he could pay her extra money for more time with her.  But Page told her that he would need to "get more money out of the ATM machine," and he was worried that would raise "too many red flags."  R. 115, Pg. ID 458.

Finally, Page used BLMGA funds to purchase guns and ammunition.  Before doing so, he asked an attorney whether he could spend BLMGA funds on firearms.  That attorney informed Page "it would not be appropriate . . . for an organization like Black Lives Matter to purchase firearms with funds of the charitable organization."  R. 144, Pg. ID 3569–70.  But Page was undeterred.  He proceeded to shell out over $2,200 of BLMGA money on a pistol, two "AR-15 style rifles," a "100-round AR-15 drum magazine," and handgun ammunition.  R. 143, Pg. ID 3384.

## B.

Eventually, Page's house of cards came crashing down.  In March 2021, a grand jury in the Northern District of Ohio indicted him on one count of wire fraud and three counts of money laundering.  The indictment alleged that Page carried out a scheme to defraud donors by misrepresenting how BLMGA would use their donations.  It further alleged that Page violated the money-laundering statutes by using the proceeds of this fraud scheme to purchase the Toledo home and furniture for that house.  Page's case proceeded to trial, he chose to testify, and the jury convicted him on all counts.

Before sentencing, the U.S. Probation Office prepared a presentence investigation report (PSR), which calculated Page's advisory sentencing range under the U.S. Sentencing Guidelines.  Page then raised numerous objections to the PSR.  As relevant here, he argued his sentence shouldn't be enhanced for obstruction of justice, challenged the loss amount, and asserted the government didn't establish he defrauded more than 10 victims.

The district court considered and overruled each of these objections.  First, the district court determined that Page should receive a sentencing enhancement for obstruction of justice because he committed perjury at trial.  Specifically, Page testified falsely at trial that he had

consulted a lawyer before purchasing the Toledo house.  Second, the district court concluded that the loss amount was $490,000 because Page spent *none* of the donated money on BLMGA's purported mission.  Third, the district court ruled that Page should receive a two-point enhancement because the scheme involved more than 10 victims.  While only six victims testified at trial, many others donated.  So the district court found that the government had met its burden to show Page defrauded more than 10 victims.

After resolving these objections to the PSR, the district court calculated Page's Guidelines range as 70 to 87 months' imprisonment.  The district court then imposed a below-Guidelines sentence of 42 months' imprisonment on each count, to run concurrently, followed by three years of supervised release.  Page timely appealed.

## II.

Page now challenges both his conviction and sentence.  He primarily argues that there wasn't sufficient evidence to convict him of the wire-fraud and money-laundering charges.  In the alternative, Page contends that the evidence presented at trial impermissibly varied from the allegations in the indictment.  And he asserts that the district court erroneously permitted the introduction of certain evidence and testimony at trial.  Finally, Page objects to the district court's application of the sentencing enhancements related to obstruction of justice, the amount of loss, and the number of victims when calculating his advisory Guidelines range.  We address each argument in turn.

### A.

Page first argues there was insufficient evidence to support his convictions for wire fraud and money laundering.  He raised a sufficiency challenge at the close of the government's case-in-chief but didn't renew that challenge after he presented evidence.  *See* Fed. R. Crim. P. 29(a).  As a result, we are limited to determining whether there was "a manifest miscarriage of justice," which requires Page to show "the record is devoid of evidence pointing to guilt."  *United States v. Dunnican*, 961 F.3d 859, 877–78 (6th Cir. 2020) (quotation omitted).  But he can't meet that heavy burden here.

1.

To sustain a wire-fraud conviction, the government must prove "the defendant (1) devised or willfully participated in a scheme to defraud, (2) used an interstate wire communication in furtherance of the scheme, and (3) intended to deprive a victim of money or property." *United States v. Palma*, 58 F.4th 246, 249 (6th Cir. 2023) (quotation omitted). On appeal, Page contends that the government failed to prove the first and third elements.[1] But there's ample evidence in the record to support his conviction.

The government presented overwhelming proof that Page carried out a scheme to defraud donors of more than $490,000 by misrepresenting that BLMGA would use those donations to combat racial and social injustice. Specifically, the government offered testimony that using the name "Black Lives Matter" "len[t] an air of legitimacy at a time of . . . heightened social awareness." R. 144, Pg. ID 3470. But Page didn't just passively rely on BLMGA's name. He actively represented to prospective donors that he'd use their donations to advance BLMGA's mission. These repeated misrepresentations provided powerful evidence that Page devised a scheme to defraud and that he intended to deprive victims of their money.

For example, multiple Facebook users contacted Page to ask how BLMGA would spend their donations. These users raised concerns that BLMGA was no longer a registered nonprofit. But Page explained that BLMGA "intentionally let [its nonprofit status] lapse" because it's "a grassroots movement" and that this would have no impact on their donations. R. 143, Pg. ID 3309. He reassured these prospective donors that BLMGA would use all funds "to serve . . . the most impacted areas" that "need additional support," such as "equipment, protest gears, food, snacks, drinks, attorney fees, tents, sunscreen, bonding people out of jail, et cetera." *Id.* Page even identified specific areas of focus for BLMGA, like "Breonna Taylor's case, Ahmaud Arbery's case, George Floyd, R. Brooks' case." *Id.* at 3310. And he insisted the use of the funds was "not personal," but rather "for the movement." *Id.* In fact, when one user expressed

---

[1]In his opening brief, Page makes a cursory statement that "the Government failed to prove . . . that he used an interstate wire to further [the] scheme." Appellant's Br. at 41. But an appellant forfeits any "issue[] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *United States v. Persaud*, 866 F.3d 371, 385 (6th Cir. 2017) (cleaned up). So we decline to address this argument.

concern that "[t]here are a lot of people taking advantage of the situation, and I want to make sure these . . . fundraiser dollars aren't going in vain," Page replied, "No, ma'am." *Id.* at 3320. Some of these Facebook users then donated to BLMGA. This pattern of interactions with BLMGA donors shows that Page willfully defrauded them.

Instead of using the money to support protests, Page used the donations as a personal slush fund. He began spending money at bars, stores, and restaurants. He upgraded his wardrobe with custom suits and other expensive menswear. He spent over $108,000 to purchase a "mini mansion" for himself. *Id.* at 3375. He hired a prostitute. And he amassed a small armory of weapons, including a pistol, two rifles, and over a hundred rounds of ammunition.

The government also presented evidence that Page's misrepresentations deprived victims of their property by inducing them to donate to BLMGA. These donors believed that BLMGA would use their funds to support protests, not subsidize Page's lifestyle. For example, one donor testified at trial that he "was not intending in any way to enrich the defendant" and wouldn't have donated if he knew how Page planned to spend the money. R. 145, Pg. ID 3697. As a result, the record wasn't devoid of evidence that Page devised a scheme to defraud and intended to deprive BLMGA's donors of their money.

In response, Page makes much of the fact that he asked Facebook to remove BLMGA as a nonprofit and pinned a notice to BLMGA's page that it was no longer registered as a nonprofit. But in that same notice, Page reiterated that BLMGA was still a "grassroots organization that exposes injustice." R. 144, Pg. ID 3454. And more importantly, he never disclosed to donors that he'd use the funds on tailored suits, a prostitute, guns and ammunition, and a new house— even when specifically asked. A rational jury could certainly find that Page's disclaimer about BLMGA's nonprofit status didn't warn donors that he was going to spend the funds on personal expenses. *See United States v. Maddux*, 917 F.3d 437, 443–44 (6th Cir. 2019). So his selective disclosures don't undermine his conviction.

Page also contends that he didn't explicitly solicit donations. That may be true. But the government presented evidence that he knew BLMGA could receive donations through Facebook and didn't follow through with changing that. Once donations started pouring into

BLMGA's bank account in summer 2020, Page took no steps to return donations or cancel fundraisers. Instead, he repeatedly misled prospective donors about how BLMGA would use the funds, thus encouraging even more money to flow into BLMGA's coffers—and ultimately into Page's wallet. When donors reached out with doubts, Page lied to gain their confidence. So even if he didn't explicitly solicit donations, there's plenty of evidence that Page devised a scheme to defraud.

Next, Page emphasizes that his efforts to "legitimize the way in which he handled incoming funds" by reinstating BLMGA as a nonprofit in Georgia and restoring the group's tax-exempt status "are hardly the actions of a fraudster." Appellant's Br. at 38–39. But drawing all reasonable inferences in favor of the government, a rational jury could've concluded that Page took those steps to cover up his misconduct. *See United States v. Acosta*, 924 F.3d 288, 296–97 (6th Cir. 2019). On appellate review, we can't "second-guess" that determination. *Id.* at 298. Thus, Page's efforts to re-register BLMGA don't undercut the jury's verdict.

Finally, Page stresses that BLMGA was a legitimate activist group and that he participated in social-justice movements and protests. But Page presented those same exact arguments to the jury, including by testifying in his own defense, and the jury rejected his version of events. It's not our job to reweigh the evidence or decide whether Page or the government had a more convincing case. *United States v. Miller*, 982 F.3d 412, 440 (6th Cir. 2020). Because the record isn't devoid of evidence, we affirm Page's wire-fraud conviction. *See Dunnican*, 961 F.3d at 878.

2.

Page also challenges his money-laundering convictions. The first money-laundering count charged a violation of 18 U.S.C. § 1956(a)(1)(B)(i) related to Page's transfer of $108,499.83 from BLMGA's account to purchase a house in Toledo. To sustain a conviction under this provision, "the government must prove three elements: (1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) knowledge that the transaction is designed in whole or in part to disguise the source,

ownership[,] or control of the proceeds." *United States v. Warshak*, 631 F.3d 266, 319–20 (6th Cir. 2010) (cleaned up).

On appeal, Page primarily argues that the government failed to establish that all $108,499.83 were the proceeds of unlawful activity.[2] According to Page, the government presented testimony from only six victims who donated less than $4,000 in total, and there was no evidence that any other donors were deceived. But there was such evidence. Government witnesses described how the Black Lives Matter name lent an air of legitimacy and credibility to BLMGA's page, which encouraged donations. Plus, Page continually represented that BLMGA was a grassroots organization and that it would use donations to fund protest supplies. So the jury reasonably concluded that Page's misrepresentations similarly deceived other individuals into donating and that the $108,499.83 were indeed the proceeds of a scheme to defraud. *See United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000) ("[M]oney, once wired by . . . victims, constitute[s] proceeds of wire fraud.").

Page was also convicted of two money-laundering counts for violating 18 U.S.C. § 1957 in connection with his purchase of the Toledo home and furniture for that house. To be found guilty of violating section 1957, "a defendant must (1) knowingly engage[] or attempt to engage in a monetary transaction, (2) know that the funds involved in the transaction are criminally derived, (3) use criminally derived funds in excess of $10,000 in the transaction, and (4) use funds derived from specified unlawful activity." *United States v. Persaud*, 866 F.3d 371, 385 (6th Cir. 2017) (quotation omitted). To satisfy the second element, "[t]he government must show that the criminally derived funds are derived from an already completed offense, or a completed phase o[f] an ongoing offense." *United States v. Kerley*, 784 F.3d 327, 344 (6th Cir. 2015) (quotation omitted).

According to Page, the government didn't establish that the underlying offense of wire fraud was completed at the time of the alleged money laundering. He emphasizes that the

---

[2]Page also makes a fleeting remark that the government didn't prove "purchasing the property in Toledo was designed, at least in part, to conceal the unlawful nature of the proceeds." Appellant's Br. at 42. But once again, we won't review "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *Persaud*, 866 F.3d at 385 (cleaned up).

indictment alleged the wire-fraud scheme continued until September 25, 2020, while the alleged money laundering occurred on August 20 and August 24, 2020. But Page misunderstands our caselaw. We've explained that the wire-fraud statute "prohibit[s] the 'scheme to defraud,' rather than the completed fraud." *United States v. Chavez*, 951 F.3d 349, 357 (6th Cir. 2020) (quoting *Neder v. United States*, 527 U.S. 1, 25 (1999)). So Page's underlying crime of wire fraud was committed the moment he misrepresented to prospective donors that their funds would be used to combat racial and social injustice. *See id.* In other words, "liability doesn't wait to attach until *after* the victim falls for the ruse" and donates, much less until after the fraudster spends that donated money. *Id.* Thus, the funds Page used to purchase the Toledo home and furniture were derived from an already completed offense, even if his scheme lasted longer. *See Prince*, 214 F.3d at 748.

Page also argues that there's no evidence he knew the funds were criminally derived. But he repeatedly misrepresented how BLMGA would spend donor funds and failed to disclose that he would instead use those donations for personal expenses. Given the centrality of Page's role in this scheme, the record certainly isn't devoid of evidence that Page knew the funds were illegally derived. *See Dunnican*, 961 F.3d at 878.

For these reasons, there's sufficient evidence to support each of Page's money-laundering convictions.

3.

Page then contends that the evidence presented at trial impermissibly varied from the allegations in the indictment. Because Page never presented this argument to the district court, we review for plain error. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). To establish plain error, a defendant must "show (1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights[,] and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (quotation omitted).

The government impermissibly varies from the allegations in an indictment "when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Robinson*, 99 F.4th 344, 364

(6th Cir. 2024) (cleaned up).  Here, the indictment alleged that Page "devised and carried out a scheme to defraud donors out of more than $450,000, by false pretenses, representations, and promises that 'donations' to BLMGA would be used to combat racial and social injustices" when in reality Page "was actually using the 'donations' for his own personal benefit."  R. 15, Pg. ID 80.  And as described above, that's exactly what the evidence at trial proved.  So there was no daylight between the allegations in the indictment and the facts established at trial.

In response, Page asserts that the government proved only that he "acted inappropriately, and converted money for his own personal use," which isn't enough to establish wire fraud. Appellant's Br. at 46.  But this argument has nothing to do with whether the allegations in the indictment differed from the evidence at trial.  Rather, Page simply rehashes his challenges to the sufficiency of the evidence, which we've already rejected.

B.

In addition, Page argues that his trial was fundamentally unfair because the district court erroneously permitted the government to introduce certain pieces of evidence.  If a defendant objects at trial, we review a district court's evidentiary rulings for abuse of discretion.  *United States v. Johnson*, 79 F.4th 684, 698 (6th Cir. 2023).  This discretion is broad, and we won't overturn a district court's decision unless it's "manifestly erroneous."  *Id.* (quotation omitted).  In other words, "we leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the district court committed a clear error of judgment." *Id.* (quotation omitted).  But when a defendant doesn't object at trial, our review is confined to plain error.  *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).

1.

At trial, Page objected that evidence related to his purchase of firearms and payments to a prostitute was unduly prejudicial.  He renews those arguments on appeal, so we review for abuse of discretion.  *Johnson*, 79 F.4th at 698.

A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  In reviewing a district

court's balancing under Rule 403, we "assume that the evidence had its maximum possible probative value and minimal possible prejudicial effect." *United States v. Harvel*, 115 F.4th 714, 736 (6th Cir. 2024) (quotation omitted). And we give district courts, which are closest to the evidence, "wide latitude" in determining prejudice. *United States v. Gibbs*, 797 F.3d 416, 423 (6th Cir. 2015).

The district court's decision to admit both categories of evidence fell well within that wide latitude. Start with the firearms. Page's purchase of guns and ammunition had substantial probative value in proving his intent to defraud BLMGA's donors. After all, these purchases had no legitimate connection to BLMGA's mission or to Page's representations that BLMGA would use donations to buy protest supplies like "water, snacks, [and] walkie-talkies." R. 143, Pg. ID 3317. What's more, Page's own attorney warned him against purchasing firearms with BLMGA's money, providing further evidence of Page's intent.

Nevertheless, Page contends that the risk of unfair prejudice outweighed this probative value because the jury may have convicted him simply for owning firearms. But Page bought his guns legally. As the Supreme Court has observed, "there is a long tradition of widespread lawful gun ownership by private individuals in this country," and "guns generally can be owned in perfect innocence." *Staples v. United States*, 511 U.S. 600, 610–11 (1994). So there was no reason to believe that the jury might convict Page based on his lawful gun ownership alone. Thus, the district court didn't abuse its discretion in permitting the government to present evidence of Page's firearms purchases.

We reach the same conclusion for the district court's admission of Page's payment to the prostitute. This evidence had substantial probative value because hiring a prostitute had no relationship to BLMGA's charitable mission and was inconsistent with Page's representations about how BLMGA would spend donations. Additionally, Page's statement to the prostitute that withdrawing more money to pay her would raise "too many red flags" demonstrates his knowledge that such use of BLMGA funds was improper. R. 115, Pg. ID 458.

Page insists this evidence created a risk of undue prejudice that outweighed its probative value. But evidence painting a defendant in a bad light isn't the same as evidence causing unfair

prejudice. *See United States v. Mercer-Kinser*, 149 F.4th 870, 881 (6th Cir. 2025). After all, "[v]irtually all evidence is prejudicial." *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983) (quotation omitted). So Rule 403 asks whether evidence is *unfairly* prejudicial, not just damaging to the defendant. *Id.* And we consider only "those inflammatory details that have little probative value" unfairly prejudicial. *Mercer-Kinser*, 149 F.4th at 881 (cleaned up). Here, the government played two relevant excerpts—totaling less than one minute—from Page's recorded conversation with the prostitute and cut out the inflammatory details. As a result, we can't say that the risk of unfair prejudice from this evidence outweighed its high probative value—let alone *substantially* outweighed it.

2.

Page next asserts that the district court erred by allowing the government to cross-examine him about whether he falsely impersonated a police officer. Because Page didn't object at trial, we review for plain error. *Kilpatrick*, 798 F.3d at 378.

Page contends that these questions violated Federal Rule of Evidence 609, which permits a party to attack a witness's credibility by introducing evidence of his prior criminal convictions. According to Page, he was never *convicted* of impersonating a police officer, so Rule 609 prohibited the government from asking him about this incident.

But Rule 608(b) permits a party to cross-examine a witness about specific instances of the witness's conduct that bear on his character for truthfulness, regardless of whether that conduct resulted in a conviction. If Page impersonated a police officer, that is clearly "probative of [his] character for truthfulness." Fed. R. Evid. 608(b). Because Page chose to testify in his own defense, the government was permitted to ask him about this incident on cross-examination.

3.

Page further contends that the district court erroneously permitted the government to introduce character evidence from four witnesses. Once again, he didn't object at trial, so we review for plain error.[3] *Kilpatrick*, 798 F.3d at 378.

Under Rule 404, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, when a defendant offers evidence of his good character, the prosecution can present character evidence to rebut the defendant's virtuousness. Fed. R. Evid. 404(a)(2)(A); *see also United States v. Clark*, 26 F. App'x 422, 427 (6th Cir. 2001) (per curiam). As the Supreme Court has explained, "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson v. United States*, 335 U.S. 469, 479 (1948). In other words, a defendant who puts his own character at issue opens the door to "tests of credibility designed to prevent him from profiting by a mere parade of partisans." *Id.*

Nevertheless, Rule 405 limits the types of character evidence a party may introduce. Specifically, on direct examination, a party may prove a person's character using only reputation or opinion testimony. Fed. R. Evid. 405(a). A party can't use specific instances of a person's conduct as character evidence unless the "person's character or character trait is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b).

Page first focuses on the testimony of a foster parent named Timothy Adkins. At trial, Adkins explained that Page accused him of abusing a foster child after the child accidentally fell down the stairs and suffered a head injury. Adkins recounted that Page posted his home address on BLMGA's Facebook page and encouraged people to protest at his house.

---

[3]Page's opening brief suggests that we should review the admission of Timothy Adkins's testimony for abuse of discretion. However, plain-error review applies when "a party objects to the submission of evidence on specific grounds in the trial court, but on appeal the party asserts new grounds challenging the evidence." *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989). At trial, Page objected only to a video exhibit that the government played during Adkins's testimony, which isn't at issue on appeal. He didn't argue in the district court that Adkins's testimony was impermissible character evidence, so we review this new argument for plain error.

Page argues that this testimony violated Rule 404(b).  But the government didn't offer Adkins's testimony "to prove [Page's] character in order to show that on a particular occasion [he] acted in accordance with th[at] character."  Fed. R. Evid. 404(b).  Rather, it offered Adkins's testimony to rebut evidence Page had introduced about his activism, virtuousness, and good deeds in the community, which Rule 404(a) expressly permits.  Page elicited testimony about his activism and introduced multiple exhibits to show him "assisting people in the community." R. 144, Pg. ID 3452.  So, under Rule 404(a), the government was entitled to rebut that evidence of Page's good character.**[4]**

The government called two other witnesses to testify about Page's character.  Lashaya Darisaw, an activist in Flint, Michigan, described her interactions with Page during the Flint water crisis.  She "did not trust" Page because he was "very divisive" and a "chaos-creator."  R. 145, Pg. ID 3710.  In fact, after she had a disagreement with Page, he began posting about her online and contacting her friends and colleagues.  Page's former landlord, Joshua Radtkin, also testified that Page retaliated against him when Radtkin tried to evict Page.  Page wrote on social media that Radtkin was "a white supremacist" and posted pictures of Radtkin's kids, so Radtkin obtained a civil protection order against Page.  *Id.* at 3740.

On appeal, Page asserts that Darisaw's and Radtkin's testimony violated Rule 405.  We agree.  Rule 405 prohibits a character witness from testifying on direct examination about specific instances of an individual's conduct, and that's exactly what Darisaw and Radtkin did when they testified about Page's online posts.  So the district court erred in permitting that testimony.  However, this error didn't affect Page's substantial rights.  That's because the government presented overwhelming evidence of Page's guilt, so there's "no reasonable possibility that" Darisaw's and Radtkin's testimony "swayed the jury such that [its] admission warrants reversal of [Page's] conviction." *United States v. Warman*, 578 F.3d 320, 347 (6th Cir. 2009).  Thus, there wasn't plain error.

Page then raises a Rule 404(b) challenge to a small portion of the testimony from Abelino Ruiz, a fellow activist who had organized several rallies and protests with Page.  Ruiz recounted

---

**[4]**Page doesn't argue that Adkins's testimony ran afoul of Rule 405, so he has forfeited any such challenge. *See Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021).

that Page once became belligerent at a Mexican restaurant, accused the restaurant owners of racism, and left without paying the bill. Even though he didn't object at trial, Page now argues that this testimony was improper character evidence. But the government offered Ruiz's testimony for two permissible purposes. First, it explained why Ruiz parted ways with Page and began cooperating with the government. Second, it rebutted the evidence of Page's good character and supposedly virtuous activism by showing that Page "was causing problems in the community." R. 145, Pg. ID 3655. So Page's challenge to this evidence fails.[5]

Finally, Page contends that the cumulative effect of admitting all this character evidence warrants a new trial. To obtain a new trial based on cumulative error, a defendant must show that the combination of individually harmless errors was so prejudicial that it made the trial fundamentally unfair. *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). But we've identified only two errors: the admission of Darisaw's and Radtkin's testimony. And even their combined effect isn't sufficiently prejudicial to render Page's trial fundamentally unfair because there was substantial evidence of his guilt. That means Page can't get a new trial.

C.

In addition to challenging his conviction, Page argues that his sentence is procedurally unreasonable. A sentence is procedurally unreasonable if, for example, the district court improperly calculates the defendant's Guidelines range. *Gall v. United States*, 552 U.S. 38, 51 (2007). Page contends that the district court incorrectly applied three sentencing enhancements, resulting in an erroneous Guidelines range. We address each in turn.

1.

First, Page asserts that the district court shouldn't have applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. We review a district court's application of the obstruction enhancement to a particular defendant's conduct for clear error. *United States v. Jackson*, 154 F.4th 422, 427–28 (6th Cir. 2025).

---

[5]Page doesn't assert that this testimony violated Rule 405, so again we don't address that potential argument. *Doe*, 989 F.3d at 425.

The obstruction enhancement applies when a defendant commits perjury at trial. *United States v. O'Lear*, 90 F.4th 519, 534 (6th Cir. 2024). To commit perjury, (1) "a defendant must make a false statement under oath," (2) "the false testimony must arise from the defendant's willful intent rather than a mistaken memory," and (3) "the statement must address an issue material to the case." *Id.* (quotation omitted). A district court applying the obstruction enhancement based on perjury must identify the specific perjurious statements the defendant made. *Id.* It then "must make either specific findings that the statements meet each perjury element or a general finding that covers all the specific elements." *Id.*

Page argues the district court didn't make the requisite findings to apply the obstruction enhancement. But the record belies that argument. The district court concluded that Page committed perjury when he testified at trial that he consulted with a lawyer in July about whether he could use BLMGA funds to purchase the Toledo house. Specifically, the district court found Page's testimony was false because that lawyer testified that his first contact with Page wasn't until August, which was *after* Page had already put in an offer on the house. The district court further determined that Page intentionally testified falsely "to try and convince the jury" he "was more deliberative and more thoughtful" by consulting with a lawyer before using BLMGA funds to purchase the house. R. 186, Pg. ID 5240. And the district court concluded that such false testimony was material because "it provided credence" to Page's story that he bought the house to use for BLMGA. *Id.* In short, the district court made each of the necessary findings to apply the obstruction enhancement.

Page next insists the district court erred in determining that this testimony was material. A lie is material if it "would tend to influence or affect the issue under determination." *United States v. Bailey*, 973 F.3d 548, 572 (6th Cir. 2020) (quotation omitted). Here, Page's false testimony about when he consulted his lawyer supported his defense that he purchased the Toledo home to use for BLMGA. And this defense was relevant to his state of mind when he accepted the BLMGA donations and spent that donation money on the house. Because intent was an element of both the wire-fraud and money-laundering charges, Page's false testimony was relevant to a key issue in the trial. So the district court didn't err—let alone clearly err—in concluding Page's false testimony was material and thus applying the obstruction enhancement.

2.

Second, Page asserts that the district court erred in calculating the loss amount under U.S.S.G. § 2B1.1. We review a district court's factual determination of the loss amount for clear error. *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). The government must prove the loss amount by a preponderance of the evidence. *Id.* But the district court need not determine the exact amount of the loss—a reasonable estimate will suffice. *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004).

The district court found that Page's scheme to defraud induced $490,000 in donations based on "gross misrepresentation[s] about what [BLMGA] was and what would be done with the money." R. 186, Pg. ID 5199. So the district court calculated the loss amount as $490,000.

Page contends that "many of the expenses were for legitimate BLMGA purposes," so "at most, the amount of loss would have been $118,810." Appellant's Br. at 53. But when, as here, the fraud is "pervasive," separating the legitimate uses isn't reasonably practicable. *United States v. Betro*, 115 F.4th 429, 454–55 (6th Cir. 2024) (quotation omitted). As a result, the district court may count the "entire amount" collected toward the loss calculation. *Id.* at 454. At that point, "the burden then shifts to the defense to prove the specific amount by which that amount should be reduced." *Id.* (quotation omitted).

Page failed to carry that burden. The district court noted that some expenses, such as traveling to the funeral of civil rights leader John Lewis, "might be appropriate" for an activist like Page. R. 186, Pg. ID 5196. But those expenses still didn't relate to Page's representations that BLMGA would use donations to support protests. Likewise, the district court concluded that the Toledo house wasn't connected to BLMGA's advertised mission of engaging in social activism in the greater Atlanta area after George Floyd's death. For instance, the district court observed that the home improvements "consisted of some rather oversized and lavish bedroom furniture" and involved "remodeling of the bathroom" to "include[] a bidet." *Id.* at 5197–98. As a result, the district court described the Toledo house as "a vanity project for Mr. Page" that wasn't "some philanthropic or great selfless gesture on his part." *Id.* at 5198. Seeing no error, we won't disturb the district court's loss calculation.

Page further argues that there's no evidence the BLMGA donors who didn't testify at trial were deceived, so their donations shouldn't be included in the loss calculation. But the district court reasonably concluded it was more likely than not that Page's misrepresentations induced BLMGA's other donors to contribute money. Page repeatedly represented that BLMGA would use donations to support protests and never disclosed he'd use the funds for his personal expenses. The evidence at trial also established that BLMGA's use of the "Black Lives Matter" name lent legitimacy to the organization, which encouraged individuals to donate. So the district court didn't clearly err in determining that all the donors were duped by Page's misrepresentations. Indeed, it defies logic to believe that *any* of these donors would've sent money to BLMGA had they known Page would use their donations to fund his lavish lifestyle.

3.

Third, Page challenges the district court's application of a two-level enhancement because the offense involved 10 or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). We review a district court's factual determination of the total number of victims for clear error. *United States v. Abdelsalam*, 311 F. App'x 832, 844 (6th Cir. 2009). A victim is "any person who sustained any part of the actual loss" of the crime. *United States v. Yagar*, 404 F.3d 967, 970 (6th Cir. 2005) (quotation omitted). The government must prove the number of victims by a preponderance of the evidence. *Id.* at 972.

The district court noted that the government presented a "sample of half a dozen people" who donated to BLMGA but acknowledged "there are many, many other people that donated, likely making the same reasonable assumptions about how [their] money would be used." R. 186, Pg. ID 5209. In fact, the government introduced evidence at trial identifying, by name, more than 18,000 Facebook users who donated to BLMGA.

Page argues that the district court erred by not identifying 10 or more victims before applying the enhancement. But when the record is as clear as it is here, there's no requirement that a district court specifically name victims before applying the enhancement under section 2B1.1(b)(2)(A)(i). Page also contends that the government didn't prove the donors to BLMGA—other than those who testified at trial—suffered any financial harm. But "the district

court is free to make reasonable inferences from facts in the record when fashioning a sentence." *United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019). And it's more likely than not that Page's repeated misrepresentations and omissions tricked these individuals into donating to BLMGA. So the district court didn't err in concluding they suffered financial loss because of this scheme and including them in the number of victims.

\* \* \*

We affirm.